[No. 3715.  Decided March 28, 1901.]

THE STATE OF WASHINGTON, *Respondent*, v. DANIEL DOWNING, *Appellant*.

HOMICIDE — IDENTIFICATION OF BODY — CONCLUSIVENESS OF JURY'S FINDING.

In a prosecution for murder, in which the identity of the dead body is a question in issue, for the reason that the flesh of its face had been eaten away beyond recognition, the verdict of the jury establishing identity of the body with that of the alleged murdered man is conclusive on the appellate court, when it appears that the deceased was last seen alive near the point where the body was discovered, that the body corresponded with that of deceased in stature, size and hair, that the clothing on it was similar to that worn by deceased when last seen alive, and that a button on the shirt was identified by a witness as having been given by him to deceased some months before.

SAME — CIRCUMSTANTIAL EVIDENCE — SUFFICIENCY.

In a prosecution for murder, the jury is not warranted in finding defendant guilty, when the evidence shows that deceased was last seen alive rowing his boat in the direction of defendant's shack, that ten days later his overturned boat was found adrift and two days subsequently his body was found partially embedded in the sand on the beach, about a mile and a half from defendant's shack; that by reason of decomposition and the feeding of crabs and gulls on the exposed portions of the face and neck it was difficult to tell whether violence had been used against deceased, but some of the persons witnessing the body were under the impression that the throat had been cut; that the defendant and deceased had theretofore had some slight quarrel over trivial matters, but there was no proof of

bad blood between them; and there were no indications of the use of violence in or about the shack or the deceased's boat, nor was there any evidence of blood upon the clothing or boat of deceased, or upon the clothing or person of defendant nor upon the contents of his shack.

Appeal from Superior Court, Chehalis County.—Hon. CHARLES W. HODGDON, Judge. Reversed.

*J. C. Cross,* for appellant.

*W. H. Abel,* Prosecuting Attorney, for the State.

The opinion of the court was delivered by

FULLERTON, J.—The appellant was informed against by the prosecuting attorney of Chehalis county, charging him with the murder of Joseph Anderson, tried, and found guilty of murder in the first degree, and sentenced to be hanged. He appeals from the judgment of conviction, and assigns numerous errors for reversal, only one of which will be noticed, namely, that the evidence is insufficient to justify the verdict. It appears from the record that the appellant and Anderson had lived in the vicinity of Gray's Harbor, in Chehalis county, for a number of years. It is not clearly shown that either of them had any fixed abode, although the appellant had a shack at Gray's Harbor City which some of the witnesses spoke of as, and the appellant called, "his home;" and that Anderson for the last few years lived most of the time in a scow located on the south side of the harbor. The appellant lived by fishing, which he gives as his principal occupation, and by catching and selling drift logs. Anderson lived by the same means, and by clam digging, and buying and selling fish. For some days prior to June 2, 1899, the appellant was at a fishing shack located on the Gray's Harbor side of Damon's Point, being that strip of land lying between the

Pacific ocean and Gray's Harbor immediately north of the entrance to the harbor, engaged in catching drift logs. The last time Anderson was seen alive by any person other than the appellant was shortly after noon of June 2d. At that time he ate his dinner at Damon's residence, which is some five miles north of the fishing shack where the appellant then was, leaving shortly thereafter in a boat, going in the direction of the fishing shack. He was dressed in a blue shirt, short coat, overalls, and wearing rubber boots. The next day a quantity of fish were missing from the Oyehut dock, evidently having been stolen the night before. This dock was some six miles distant from the fishing shack where the appellant had been stopping, and towards which Anderson was seen going on the day before. Within a day or two thereafter a warrant was sworn out for the arrest of the appellant and Anderson, charging them with having stolen the fish. The appellant was arrested on the warrant, and a search of his premises made for the stolen property, but, as nothing was found to implicate him in the theft, he was discharged without trial. Anderson was not arrested, or, so far as it appears, found by the officer having the warrant. On the 12th of the same month Anderson's boat was found drifting in the waters of the harbor, overturned.

On the 14th of June, 1899, the body of a man was discovered lodged on the Damon Point beach somewhere near a mile and a half from the fishing shacks above mentioned. The body was lying on its back, directly behind a large log, partially embedded in the sand. The left arm lay along the side of the body, partially under the log, the hand entirely covered, the right arm was extended horizontally, leaving the hand exposed. The feet were bare. It was dressed, according to the testimony of the two witnesses who first discovered it, and of another who saw the

body the same day, in overalls and blue double-breasted shirt, and, according to the undertaker who removed the body, it had on, in addition to the clothing described, a suit of underclothing and a coat buttoned over the shirt. Between the clothing and the body sand had washed and packed to such an extent that the clothing had to be torn and cut in order to remove it. The flesh from all the exposed parts of the body had been eaten off, as some of the witnesses testified, by crabs and gulls. The eyes were gone. The point of the chin and all the facial bones above the chin were bare. Describing the throat, one of the witnesses who discovered the body said:

"We noticed a cavity or space between the chin and the collar of the shirt. We noticed a cavity there that might have been probably two and a half inches or an inch wide. It seemed to extend quite far back into the throat."

Another testified that the shirt was buttoned quite close around the neck, and between that and the chin "there seemed to be a dark shade about the thickness of a man's hand; . . . a crack or cavern right under the chin. It looked to me, you might say, the skin and the flesh was very evenly parted by some sharp instrument; smoothly done, as near as I could do it, or anybody else." Another testified as to the opening, giving its size as about the width of a lead pencil, but whether it was rough, jagged, or smooth on the edges he did not look closely enough to see. The undertaker who removed the body testified that all of the flesh on the exposed side of the neck above the collar of the shirt was gone, leaving the flesh even with the shirt line. The body was removed from the place where it was found, and taken to Aberdeen, and buried on the 17th of the month. The next day it was exhumed at the order of the coroner, and on the 21st an inquest was held, and the body reburied. The appellant's arrest followed the coroner's inquest, and upon his motion the body was

again exhumed on July 5th on the order of the trial court, and examined by physicians appointed for that purpose.'

It is urged that there was not sufficient evidence to justify the finding of the jury that the body was that of Joseph Anderson. It is true that the body was so far mutilated that little was left of the physical features by which identity could be established, but on this question we cannot say that the verdict of the jury was not supported by sufficient evidence. All the witnesses agree that the size and stature of the body was the same as the size and stature of Anderson, and one purported to identify it as Anderson's body by the teeth, although on this point he was contradicted as to the actual condition of the teeth of the body. All of the witnesses agree, also, that the clothing found on the body was similar to that worn by Anderson, and one identified a button found on the shirt as one he had given Anderson some months before. Still another says the hair of the head was iron gray, which seems to be conceded to be the color of Anderson's hair. This, taken in connection with the fact that the body was found near where Anderson was last seen alive, made a case sufficient to go to the jury, and, this being true, their finding thereon must be accepted by an appellate court as conclusive.

It is next urged that the evidence was insufficient to justify the finding of the jury that the death was the result of a crime. The principal witness on behalf of the state as to the cause of death was the county coroner. He was a physician and surgeon of long standing, having practiced his profession for over forty years. He testified that he first saw the body on the 18th of June, in the cemetery, where it was exhumed for the first time; next on Wednesday the 21st; and lastly on the 5th of July following. Speaking of its condition, on his direct examination, he said:

"The first time I examined, the indications were plain to me that the throat had been cut,—the carotid arteries cut off; the flesh gone from the face and head and skull, and some decay had commenced to take place. The corpse was somewhat offensive. There was a spot over the frontal bone that had every indication there had been a blow. There was discoloration. It was not natural."

The coronal suture on the left side "was slightly open, and blood oozing from it." The common carotid artery was severed below the point of bifurcation. The trachea was not cut. The upper portion of the undershirt was very dark. "It had the appearance to me of having been colored with blood." The flesh above the clothing had a smooth, clear line of demarkation. The jaw bone was visible, having no flesh on the point of the jaw, but some back under the jaw. "I thought at first that the point of the epiglottis had been clipped off, but on the last examination I found it was not the case. I thought the evidence so plain that I did not make as close an examination as I would otherwise." Asked what, in his opinion, was the cause of death, he answered: "It was caused by having his throat cut." The blow on the head, he testified, would not have been sufficient to cause death, though it might have stunned the person for a time. On cross-examination, he said he had testified before the committing magistrate. Did not remember whether he had testified then that no one but a surgeon could sever the carotid arteries without affecting the windpipe, though he might have so testified. That he did say there was a point cut off the epiglottis of about one-half or three-quarters of an inch. Did not remember whether he testified before the committing magistrate that he didn't examine closely enough to see whether the esophagus or trachea had been cut, or whether he said no one could cut the arteries without cutting the windpipe. If he did, "it would be on supposition." He did not remem-

ber whether or not he had pointed out to the physicians appointed by the court to examine the body the distortion of the skull, but presumed he did. He testified further that the flesh was all gone from beneath the chin, and nowhere extended from jaw to jaw; that, if the throat was cut, it was cut above the epiglottis; that he did not make sufficient examination to ascertain whether the internal carotid artery was cut or not; that the discolored undershirt was not removed from the body, and was buried with it.

Dr. Smits, one of the physicians appointed by the court, testified: That the carotid arteries were severed on a line, and that the edges were smooth. That it was impossible for any one to say whether the arteries were cut with a sharp instrument or not. "All I can say is that they seemed to be smooth cut. Whether they were cut with a sharp instrument or not, I could not say; but they were smooth, and all on a line, and further than that I could not say." That he examined the skull at the place indicated by Dr. Bush for fractures, and could find none. Could observe no blood stains, such discoloration as there was came from decomposing flesh. That the flesh was all off the lower jaw bone and most of the face. The trachea and glottis were intact, and showed no cuts or abrasions. The line of flesh from the clavicle backward was plain in front, but further back it seemed to lose itself in the decomposing flesh of the neck. The demarkation was not clear. The carotid artery was severed below the point of bifurcation. "Q. So it was just one artery you found? A. That is all."

Dr. Walston, the other physician appointed by the court, testified: That he examined the body in connection with Dr. Smits. That he examined the skull specially at the place pointed out by Dr. Bush, but found no fractures or distortions there or elsewhere. That the trachea and esoph-

agus were intact. That he observed the carotid artery. It was severed below the point of bifurcation, and from two and a half to three and a half inches of it gone. That it would be impossible for it to retract to the point where it was found if severed above the trachea. Besides, it would have been cut above the point of bifurcation; and two arteries, one in front of the other, instead of one, would be found. That the veins had all collapsed and decomposed with the flesh, so that they could not be seen. He was not asked as to his opinion concerning the cause of the death.

We have quoted from the testimony of a part of the witnesses who discovered the body. Another testified: That on finding the body he took a stick, and scraped the sand off the neck and from the side of the head, so as to see the hair. That he noticed "they were clotted with a kind of something that looked like blood,—had been clotted together. I could not tell what. I didn't look close enough to see, but it was on the right side of the head." This witness testified that the flesh seemed to be severed on a line with the clothing buttoned around the neck, and had a smooth appearance; that he had no opinion, based on what he observed, as to the cause of the cavity in the throat, or why the flesh was off the face, but he saw a number of sea gulls around the body when he first came up to it, and "supposed they picked it off." He testifies also, that the skull was cracked,—"a split about three inches long;" but, when pressed on examination, he admitted that it might have been the line of the coronal suture which he had mistaken for a "split." Other non-professional witnesses testified that the flesh on the throat looked like it had been severed by some sharp instrument, but their general description of its appearance did not differ materially from the description given by the witness from whom we have quoted.

Our attention is called to much in the record concerning the relations existing between the appellant and Anderson previous to the disappearance of the latter, and to statements made by the appellant relative to his disappearance subsequent to that time. It is insisted first that they were partners. Why this fact is deemed material does not clearly appear, but conceding it to be so, there is little or no evidence to support it. It is not shown that they were ever engaged in any joint adventure, or that they owned any property in common. It does appear that the appellant at one time marketed a few logs belonging to Anderson along with certain of his own,—the circumstance referred to farther on,—but it is not claimed that they were jointly interested in them. The evidence relied on, however, is the statement of a witness to the effect that the appellant spoke of himself and partner as having a raft of logs ready for market. The witness states directly that the appellant did not give the name of the partner, nor did he know to whom he referred, and that the conversation occurred close to or about the time of the disappearance of Anderson. How this testimony established a partnership relation between the appellant and Anderson it is somewhat difficult to understand. It is next shown that the appellant and Anderson had had difficulties on one or two occasions. The most serious of these was over a rope. It seems that Anderson had picked up a rope that the appellant claimed, and had carried it to the Hoquiam wharf for the purpose of taking it away with certain other articles he had at that place. The appellant appeared at that time, claimed the rope, and took hold of it. Anderson then took hold of it, and the two went to pulling on it. The further proceedings are detailed by the state's witness as follows:

"They got hold of it,—hold of each end of the line,—

and pulled around there quite a while; and finally Mr. Anderson reached in his pocket, and pulled out a knife, with no intention to hurt any one,—pulled out a knife to cut the line in two,—and I said, 'Hold on Joe, I would not cut that line in two,' and I persuaded him not to cut the line; and in the meantime Mr. Downing got out his knife, and Tommy Soules and I made him put it up.

Q.   What, if anything, did the defendant do, or attempt to do, with the knife? A. He didn't do anything. We didn't let him do anything.

Q.   What did he say? A. Well, that would be pretty hard for me to tell exactly.

Q.   As near as you can? A. He drew the knife out, and he says,—in the first place he says, when Mr. Anderson drew his knife he says,—'You are going to cut me, are you,' and old Joe didn't make any pretensions toward doing anything of that kind. He reached in his pocket, and got out his own knife, and said he would do a little cutting himself if Joe was going to do any; and Tommy Soules and I interfered, and made him put his knife up. I told you I didn't remember exactly what he said. There was quite a conversation took place, and it was really nothing to me. I didn't pay attention to it particularly. I could not say exactly what the conversation was. . . . Tommy Soules says; . . . 'I will tell how we will settle this. Let me have the line, and I will put it away up in the warehouse, and when you come to the conclusion who is the owner, why, I will give that man the line,' and they both agreed to it, and Tommy took the line, and curled it up, and put it away in the warehouse, and it is there yet.

Q.   State whether or not either party expressed any threats at that time? A. Well, no; I don't think there was."

On cross-examination the witness said both parties had been drinking, and were slightly intoxicated. It was shown also that previously on the same day the appellant and Anderson had a dispute over the amount due Anderson for certain logs which Anderson had turned over to the

appellant for sale. The logs were rafted with a number belonging to the appellant, and the question was what proportion of the rafting charges Anderson should pay. The state's witnesses go over the matter in detail, and show that some coarse, drunken talk was indulged in between the two. One of them testifies to a threat made by the appellant against Anderson; another to the threat, but was unable to state whether it was Anderson or the appellant who made it. The appellant finally suggested that they submit the dispute to the decision of some third person. This was done, and the matter was settled in that way. Of the statements made by the appellant subsequent to the disappearance of Anderson those claimed to be the most damaging are found in the testimony of witnesses Ziegler and Grayson. The former testified that the appellant employed him to repair a pair of shoes, and while in his shop made statements relative to the disappearance of Anderson, which he relates as follows:

"He [meaning appellant] says, 'they are all down on me,' and Mr. Dinsey—he blamed Mr. Dinsey for being one of his enemies—and 'Mr. Dinsey,' he says, 'don't know what he was speaking about.' He says, 'What they got him here for?' And they wanted to know where Anderson is, and he says, 'Anderson is dead, drowned;' and why he knows it, he says, he started out in a small boat, and according to the rough weather he could not come out when he would get the fish in the boat; he could not make it; and he says how he hated to go and live in that neighborhood, or live in that neighborhood, and meet the dead man's face, and he have to meet him some place. So they kept on talking together, and after a while they started out of the shop, and when Mr. Downing came in again he got his shoes, and I didn't have no more talk with him, and Mr. Dinsey didn't come back any more."

The cross-examination was as follows:

"Q. You say you don't know when this was?

A.    What did you say?

Q.    Do you know what month it was?

A.    Well, it was in the month right after he was discharged on the first arrest.

Q.    It was after the discharge?

A.    Yes.

Q.    He was getting ready to go home?

A.    Yes, sir.

Q.    Was he telling about their having him arrested up there?

A.    Yes, sir.

Q.    He was grumbling about these other people,—said they were prosecuting him, or were down on him?

A.    Yes, sir.

Q.    And he was accusing Mr. Dinsey of being one of the parties to the prosecution?

A.    Yes, sir.

Q.    How did the matter of Anderson come up? Who spoke about Anderson first?

A.    Well, really, I could not tell was it Dinsey or was it Downing. He says, 'They have got me here for stealing fish,' and he says, 'That Anderson——.' He blamed Anderson for stealing the fish. That is what Downing says.

Q.    He says Anderson was drowned?

A.    Yes, he says, 'Anderson is drowned.'

Q.    He told you why he thought so?

A.    Yes, because in the small boat he started out, and he could not make it and by having so many boxes of fish in his boat.

Q.    He said he had so many boxes of fish in that boat?

A.    And in the rough water, rough weather.

Q.    In the rough weather he would get drowned?

A.    Yes, sir.

Q.    That is the reason why he thought he was drowned?

A.    Yes, sir.

Q.    You say he then stated that he didn't want to go back down there for fear he would meet him, or see his dead body?

A.    He hated to go back, but he had to go and live in that neighborhood."

The testimony of Grayson, as shown by the record, was as follows:

"Q.   Give your full name.   A.   Lester A. Grayson.

Q.   You are subpoenaed as Lester Grayson.

A.   Yes, sir.

Q.   Where do you live?   A.   Gray's Harbor City.

Q.   Did you know Dan Downing?   A.   Yes, sir.

Q.   This man here? (referring to defendant).   A.   Yes.

Q.   You are a stepson of Jacob Eyerly?   A. Yes, sir.

Q.   And you live with him at Gray's Harbor City?

A.   Yes, sir.

Q.   Do you remember a conversation which you had with Dan Downing in his shack at Gray's Harbor City?

A.   Yes, sir.

Q.   When was that?   A.   Sunday the 11th.

Q.   Of what month?   A.   June.

Q.   Who was present?   A.   Willie Hughes.

Q.   Was Willie there all the time?

A.   He left a little while before I did.

Q.   Willie Hughes is a witness here is he not?

A.   I think he is.

Q.   Did you have a talk with Dan Downing that day?

A.   Yes, sir.

Q.   Go ahead, and tell the jury the conversation,—what it was?

A.   Well, I went into Mr. Downing's cabin,—it was about nine o'clock, or a little after,—and I asked him if I could get some chewing tobacco, and he had no chewing, but he had some smoking, I went and got some smoking tobacco, and we was speaking of different parts of there, and acquaintances over there, and acquaintances around there, and I began to talk with him about Jim Fowler at Sand Island, on the Chehalis river, and he said he never knew anything good of him, and I told him I didn't either; that he beat me out of fifteen dollars.

Q.   Who are you speaking about?

A.   Jim Fowler.   And then we quit that subject for a few minutes, and he got arrested for supposed to be stealing fish and he got out of that, and—

Q.   Just tell what he said,—what Downing told you?

A.   He was sitting in Frank Kaufmann's saloon—

Q.   Did he say this?

A.   Downing said that,—that he was sitting, I think, in Frank Kaufmann's saloon in the afternoon,—and Fowler came in, and began to accuse him.

This is all objected to.

By the Court:   Did Mr. Downing tell you that?

A.   Mr. Downing told me that.

Q.   When you saw Downing in his shack?

A.   Yes, when I was down in his shack.

Q.   What has that got to do with this?

A.   I suppose he had to explain.

By the court:   Just tell what Downing said.

A.   He was sitting in Frank Kaufmann's saloon, I think, he said, and Frank Kaufmann——

This is objected to by counsel for the defense as it is not competent.

By the court:·   He may show anything that Downing said about this case, he may so testify:   Just state what he said, if anything, about Joe Anderson and about this case.

A.   Well, he was sitting in Frank Kaufmann's saloon and he had just got out of jail up here and Jim Fowler came in—

By the court:   Just state what Mr. Downing said about Joe Anderson, never mind what he said about Jim Fowler or anybody else:

A.   Well, Joe Anderson—he said that Joe Anderson and some other man had mysteriously disappeared, and no one ever knew what became of him.   I believe that is all he said, if I remember.

Q.   What, if anything, did he say with reference to the time they disappeared?

A.   He didn't mention that at all.

Q.   State whether or not Downing made any reference in that conversation to himself, or used the words 'Old Dan.'

A.   Yes, sir.

Q.   Tell what that was.

A.   He said "Old Dan" had outlived Joe Anderson

and some other man. I forget the name. I forget who he was. I don't remember.

Q. Was the word Heap used there?

Objected to as improper. Objection sustained.

Q. Was that all that was said, Lester?

A. Yes, I think it was, as near as I can remember.

Q. You haven't given the part concerning Fowler?

A. No.

Q. You have left that out?

A. Yes, sir.

J. Did you have any other talks with Downing?

A. No; not since then."

CROSS EXAMINATION.

"Q. The piece you had to speak is spoiled?

A. Sir?

Q. The piece you had fixed up to say is spoiled?

A. No, sir.

Q. You didn't get to say what you thought you were going to get to say?

A. No, sir.

Q. Then it is spoiled, is it not?

A. The court didn't allow me to say—

Q. So what you had fixed up to say is spoiled?

A. I had nothing fixed up to say only what Mr. Downing told me.

Q. This was the first time you had ever seen Downing, was it?

A. It was, sir.

Q. That morning about nine or ten o'clock was the first time you ever saw him?

A. No, sir; I went one time and passed over, and just seen him. It was the first time I ever spoke to him, though.

Q. The first time you ever spoke to him, you went in and asked for tobacco?

A. Yes, sir.

Q. He said he didn't have chewing and you went on to help yourself to what he did have?

A. Yes, sir.

Q. You did?

A.   I took a little bit of smoking, yes.

Q.   How long were you there?

A.   About half an hour or more.

Q.   You stayed there half an hour?

A.   Yes, I guess a little over half an hour.

Q.   Did Downing tell you to call again?

A.   Yes, sir.

Q.   What was Downing doing when you first went in?

A.   He was standing up at the table, scraping something, I think.

Q.   What was he doing when you left?

A.   He laid down on the bed.   He was laying down.

Q.   Was he reading a newspaper?

A.   I think he was.

Q.   The tobacco was sitting on the table, wasn't it?

A.   Yes.

Q.   And you say the little Hughes boy was there?

A.   Yes, sir.

Q.   He was standing around mixing up with you and Dan Downing in your talk there?

A.   Oh, yes; but he left before I did.

That is all."

Still another is the statement of an Indian witness, who testified that the appellant asked the witness to go with him in search of Anderson's body, saying that he *saw* Anderson drown.

The appellant testified in his own behalf.   On his direct examination he stated that the last time he saw Anderson was on the evening of June 2d; that Anderson came to the fishing shack on the Damon Point beach in the evening of that day; that he left there in his boat between seven and eight o'clock, going in the direction of Oyehut dock, saying he was going to that place to get some thousand pounds of fish.   In detailing the conversation between himself and Anderson, he said that Anderson requested him to keep a light burning until he returned, as he might, in the darkness

of the night, go around the point and out to sea.  On
cross-examination he said that he kept the light burning
until after eleven o'clock, when he put it out because he
had but little oil; giving in this connection the further
explanation that Anderson had inquired of him how he
might go from the Oyehut dock by way of Grass Creek
on his way to Hoquiam, and that he thought, when he
did not return by that hour, that he had gone in that di-
rection.  It was thought material to contradict him as
to the matter of the amount of oil in the lamp.  Two wit-
nesses were recalled, who testified that they were at the
shack some fourteen days later, and found a lamp there
nearly full of oil.  No testimony was offered directly· ex-
plaining this difference,' but the description of the lamp
found by the witnesses and the one described by the ap-
pellant as having been used by him do not coincide in
any particular, and it appears that this shack was a com-
mon stopping place used by every one who happened to
be in its vicinity and desired a temporary shelter.  We
would hardly have thought this circumstance of sufficient
consequence to deserve mention were it not for the fact
that stress is laid upon it in the brief, and the fact that
a juror who made an affidavit in ·opposition to the motion
for a new trial mentions it as being considered as of some
importance while the jury were deliberating upon their
verdict.  The foregoing, with some additional minor con-
tradictions, and the testimony of witnesses to the appel-
lant's reputation for truth and veracity, constitutes the
material part of the case on the part of the state.  There
was no evidence of blood stains on the clothing taken from
the body nor on the overturned boat.  There was no evi-
dence of a struggle at the shack where the murder was sup-
posed to have been committed; no blood stains on the
floor, the bed, or bed clothing, nor on the clothing of

the appellant.    There was some testimony to the effect
that the appellant had left certain of his underclothing in
water at his shack in Gray's Harbor City until they had
soured, but it is not shown that they bore evidences of
blood stains, or that they were anything more than cloth-
ing that had been worn too long without washing.

The theory of the state is that Anderson was killed by
the appellant on the evening of June 2d, the day he was
seen going in the direction of the fishing shack where
the appellant then was.    It is suggested that the murder
occurred after Anderson had removed his outer clothing
for the purpose of retiring, or after he had retired; that
he was first struck on the head and stunned by some blunt
instrument; that his throat was then cut; that the mur-
derer then dressed the body with its customary clothing,
omitting the foot gear, threw the body into the waters of
the harbor, and overturned and cast adrift the boat; that
the murderer then went to the Oyehut dock, secreted the
boxes of fish, so as to make it appear that Anderson had
gone there to steal fish and had been drowned in the
attempt.    This theory, it is said, accounts for facts that
would be otherwise seemingly inexplicable; that it ac-
counts for the fact that no blood stains were found upon
the clothing other than the undershirt; that no blood
stains were found on the boat, or in the shack, or that there
were no evidences of a struggle at the shack; that the feet
were bare; and that no traces of the fish, or the boxes
which contained them, were discovered.    But it seems to
us that the evidence falls far short of proving this the-
ory.    The body when first discovered had been dead for
some thirteen days.    It lay for three days where found
before it was removed.    During all of this time it was
subjected to the ravages of the creatures of the sea, and for
how much of this time to the ravages of carnivorous birds

is not known. All of the exposed parts of the body had been denuded of its flesh. Manifestly, the statements of witnessses, who did no more than look at the body where it was lying, to the effect that the flesh on the throat had the appearance of having been severed by some sharp instrument is not entitled to much weight when the cause that produced the death is the matter in issue. The only one of the physicians who expresses the opinion that death was caused by the cutting of the throat saw the body for the first time after it had been dead seventeen days, and after it had been transported several miles, buried, and exhumed. That his examination of it then was but little more than cursory is abundantly proved by his own statements. Between that time and the last time he examined it, he was a witness on the preliminary examination of the appellant. Then he testified to conditions which he afterwards admits did not exist, and he was mistaken as to the color of the undershirt. Surely, if mistaken in particulars directly before his eyes, he might be mistaken in the more important one, viz., his statement as to the cause of death. Again, it would appear that he was mistaken as to the rupture at the coronal suture. This would not heal after death, and, had it been visible at the time he first examined the body, it ought to have been so to the physicians appointed by the court. · And that his statement concerning the carotid artery is much weakened by the testimony of the other physician is also apparent. True, there is nothing in the record which tends to impugn the honesty of the witness. He was frank and open in all of his statements. If aught appears against him at all, it is his intense interest in the result of the prosecution, arising, no doubt, from an honest conviction that a crime had been committed, and the desire to see the guilty party brought to justice. But, giving his testimony all the weight to

which it is entitled, it cannot be said that it establishes the fact that the death of the deceased was caused by cutting his throat to that certainty which this character of case requires.

But it is asked, how can the bloody undershirt be accounted for? If it were necessary to account for it at all, perhaps the best answer would be to say that no one testified that the undershirt was bloody. The most that can be said for the state's evidence on this point is, that certain of the witnesses said there was a dark stain on the breast of the shirt next to the throat, "which had the appearance of being colored by blood." This falls far short of proving the fact. In truth, it would appear that the fact that these stains were of importance was largely an after thought. If what is contended for it now be true, it was the only telltale garment upon the body, yet it is the only one not preserved and produced for examination. It would seem that if it had been regarded as of vital importance when evidence of crime was being sought for, it would have been subjected to such examinations and tests as would put the possibility of mistake beyond cavil.

Stress is laid upon the fact that the feet of the body were without covering, as being a circumstance tending to show the improbability that the death was caused by drowning. It is said in the brief of the state that "the inherent improbability of Anderson, while actually drowning, being able to remove his shoes, . . . is apparent," and from the affidavit of the juror above referred to, this fact seems to have been considered by the jury as of importance while making up their findings; this on the theory, apparently, that his distress would be so great that he would have no time to unlace them. But the strange part of all this is that there is not a line or syllable of testimony in the whole record—at least noth-

ing is pointed out to us, and we have found nothing—that indicates that Anderson was wearing shoes at that time. On the other hand, the only witnesses who mention his foot gear say he was wearing rubber boots. It is so stated by the state's witness who saw him at Damon's residence on the day of his disappearance, and by the appellant himself. Certainly it would not be unnatural for one familiar with water to remove from his feet such cumbrous articles as rubber boots at the earliest moment he anticipated the possibility of being thrown into water where he would be obliged to swim. In this connection, as illustrating the straits to which the state is driven, another matter is worthy of mention. Evidence was introduced showing the condition of the Oyehut dock as tending to prove that Anderson could not have stolen the fish because of the impossibility of getting them from the dock into the boat. Speaking to this question, the counsel for the state says: "From an inspection of the dinkey [Anderson's boat] and the photograph of the dock it is clear that it is a physical impossibility for one man to put even one box of fish in the dinkey from off the Oyehut dock, and *a fortiori*, it was a physical impossibility to load ten boxes, or even half that number, of boxes of fish in the dinkey;" yet, in almost the same breath he says, "Would it not have been possible for Downing, after killing Anderson, to have thrown his body into the bay, cast the dinkey adrift after overturning it, then go to the Oyehut dock, secrete the boxes of fish . . . and then assert . . . that Anderson had gone to steal fish, and was probably drowned in the attempt?" Why this physical feat would be impossible for the one and possible for the other, or why Anderson might not take the fish off the dock over the same route the appellant would have to take them to secrete them, is not naturally apparent, nor is it

explained in the record. On the question whether or not the boat could carry the fish, the state's case is silent. The appellant says that it would if the fish were taken from the boxes and put into the boat loose; and it was in this manner, he testifies, Anderson told him he was intending to load the fish. Another argument in this connection is that no trace of the fish boxes was found. It is said that had they been broken, and cast adrift, they certainly would have been seen. How potent this reasoning is may be gathered from the fact that the boat itself, which was of considerable dimensions, drifted for ten days before it was discovered, and, so far as it appears, no effort was made to find traces of the boxes until some weeks after they were lost.

The statements made to the witness Ziegler by the appellant to the effect·that he hated to meet the dead man's face, and to Grayson, that he had outlived Joe Anderson "and some other man," we cannot think are entitled to the importance given them by the state. The first expresses a not unnatural feeling of men of his class, and the second—whatever else may be said concerning it—cannot be tortured into a confession of guilt. As to the testimony of the Indian witness, he states that the conversation between him and the appellant was had in Chinook. Admitting that the witness repeated the conversation as he understood it, it would hardly seem to one familiar with this barbarous jargon that the fact that the appellant made the statement attributed to him was proven beyond a reasonable doubt. The quarrel over the rope and the money received from the sale of the logs, however effective they might be as corroborative evidence were the main. crime substantially proven, standing alone, are entitled to but little weight. More than this, they are shorn of much, if not all, of their virulence by the evi-

dence of the defendant's witnesses, who had equal opportunities to observe the conduct of the parties, and to hear what was said between them.

What little basis there is in the evidence to support the ingenious theory put forth by the state is apparent from the recitals we have made from the record. Its purpose, however, is rather to account for the lack of evidence than to reconcile facts shown by the evidence. How ineffective it is in this regard needs but little consideration to show. If the blow which is said to have stunned the victim was struck after he had removed his clothes, it must have been struck while he was in the shack. The murderer must then have carried or dragged him out of the shack to some obscure place before cutting his throat, else there would have been evidences of blood on some of the surroundings. After cutting the throat, he must have waited until the body had quit bleeding, and have washed off the gore, before replacing the every-day clothing, else they would certainly have borne some marks of contact with the blood of the deceased. It would hardly seem possible that a person capable of such cool, fiendish deliberation would have cast the body adrift with knife marks upon it capable of being recognized the moment the body was discovered, or that he would have cast it adrift at all, when it would have been so easy to conceal it where there was scarcely a probability of its ever being discovered. But this, as well as the theory advanced by the state, is mere speculation. The question is not what the appellant might have done, but what in fact did he do. Without further pursuing the inquiry, we conclude that there is no substantial evidence upon which the verdict of the jury can be sustained, and the judgment of this court will be that the judgment of the court below be reversed,

and the cause remanded, with instructions to discharge the appellant; and it is so ordered.

REAVIS, C. J., and DUNBAR, ANDERS and WHITE, JJ., concur.