Sam PUMPKIN, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12249.

Criminal Court of Appeals of Oklahoma.

March 28, 1956.

**820**

Frederick D. Green, J. Fred Green, Sallisaw, Joe Cannon, Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, Judge.

The plaintiff in error, Sam Pumpkin, defendant below, was charged by information in the District Court of Cherokee County, Oklahoma, with having committed the crime of murder on or about the sixth of March, 1955, with premeditated design, and did effect the death of one Jessie M. McLain, by means of a heavy blunt instrument with which he did strike Jessie McLain and inflict mortal wounds on the back of her head and thereafter cause to be set

fire her log dwelling and left the body of the said Jessie M. McLain to be burned and partially destroyed by said fire. He was tried by a jury, convicted, his punishment fixed at life imprisonment in the penitentiary, judgment and sentence were entered accordingly, from which this appeal has been perfected.

The crime herein alleged was committed without eyewitness and the proof other than the defendant's confession is entirely circumstantial. The facts disclose that Mrs. McLain was a widow, 68 years of age and resided alone in her log cabin home some 17 miles northeast of Tahlequah. She was in good health despite her age and performed most of the ordinary labor around the place such as feeding her stock on the farm. It appears that the defendant had known Mrs. McLain for some 20 years and had performed labor and services for her as a boy and even as late as shortly before Christmas, 1954. His brother and he were supposed to report for work on Saturday before the crime was committed on Sunday, March 6. However, it rained on Saturday and the defendant and his brother had planned to report on Monday and do the plowing and other things for Mrs. McLain. The record discloses that on Sunday, March 6, the defendant had left home with his parents who were going to church, but when they reached Brigg's Store, they went on and left the defendant behind. Shortly thereafter, he went to the Pritchett home, a short distance away, where he met Dennis Pritchett, his cousin. The defendant expressed a desire for a drink of liquor. They then went to Andrew Pritchett's house, picked him up and then went to Ovie King's home where they procured a one-half pint of whiskey. (Moonshine.) They drank the one-half pint and continued procuring whiskey from Mrs. King until they had drunk two and one-half pints. Somewhere around 2:00 P.M., it appears the Pritchett boys left the defendant when they drank all the whiskey.

Several people saw the defendant going from the vicinity of the Kings in the direction of Mrs. McLain's home. Ulyus Warren, among many that saw him, said the defendant stopped at his place about 5:00 or 6:00 P. M. Shortly thereafter he left, going northeast in the direction of Mrs. McLain's, stating he had to be going, he was sick.

Joshua Claud, Jr., who lived on the road between Mrs. McLain and Ovie King, said he was pumping up a flat tire on the road when the defendant approached him going east. He talked to him about two minutes, and stood within two feet of the defendant. He testified he could smell whiskey on him. Joshua's brother was with him at the time. On cross-examination it was disclosed that he told his parents about seeing the defendant and about how drunk Pumpkin was.

The defendant was also seen going in the direction of Mrs. McLain's by other people. The evidence discloses particularly, that Mr. and Mrs. Ben Cordray and their family, who lived about one-half mile north of Mrs. McLain, about 7:15 P.M. passed Mrs. McLain's house on their way to church in Tahlequah. They testified Mrs. McLain had her flood light on, on the back porch, and the defendant, Pumpkin, was seen standing there talking to her. About 10:30 P.M., Mr. and Mrs. Cordray, returning from church, saw that Mrs. McLain's house was on fire. The top had been consumed and most of the walls were burning. They were unable to find Mrs. McLain so they called the sheriff. Mrs. Cordray testified that she saw something in the burning house that looked like a body. It was about three feet back from the front door.

Pauline Marion, Mrs. McLain's niece, who arrived before the fire burned out, testified she saw something that looked like a body, in the same place.

Dr. S. J. T. Hines, who was called to the scene of the crime while the house was still burning, returned on the morning of the seventh of March about 7:00 A.M., after the embers had cooled down, and found the part of a body at the point where Mrs. Cordray and Pauline Marion said they saw what looked to be a body, during the fire. Dr. Hines said the remains of the body were lying on its back. He rolled the body over and he discovered the back part of the head had been crushed by a blow, just like it had been hit by a club. The blow would have been fatal, he explained. It was

caved in just as you would ·crush a green gourd. "It was busted enough so that when I turned her over the brains would run out of that fracture or crushed place," he testified. On cross-examination it was developed through Dr. Hines that the hole in the back of Mrs. McLain's head was about as large as the palm of the hand, was round, and it was his opinion that his examination disclosed that the fracture in the back of the head was made before death. He said because it had laid there in the blood and that portion of the body had not burned up, and the skull was cracked. He testified positively the fracture was made before the fire.

Sheriff Herrin testified that under the body it was wet, and the skin under the body which had not burned up had a sort of yellowish tinge.

The defendant was the last person seen with Mrs. McLain.

It appears the defendant wandered around the neighborhood until about 1:00 A.M. when he knocked on the door of the Pritchett home wanting to be admitted. He stated that he was cold. Mr. Pritchett stated that he had a full house but let him come in and lie down by the stove. The officers came about 2:00 A.M. and arrested the defendant.

Deputy Sheriff D. L. Collins testified that he and Andy Griffin, the jailor, arrested the defendant at Bill Pritchett's home and took him to Brigg's Store where they met the sheriff and Jim D. Rogers, another officer.

Collins testified that Pumpkin talked like a drunk man. The sheriff turned a flash light upon the defendant and observed blood upon his shirt and the bib of his overalls. Whereupon, the sheriff asked Pumpkin why he did it and Pumpkin replied, "My nerves were hurting me, I guess, that's why I done it." Sheriff Raymon Herrin corroborated Deputy Sheriff Collins with reference to the conversation with the defendant as to why he committed the crime as did officers Andy Griffin and Jim D. Rogers.

Subsequent thereto, the defendant was taken to the county attorney's office in Tahlequah, where after being advised of his constitutional rights, he made a signed, witnessed confession.

The substance of the defendant's confession was to the effect that he had been drinking with the Pritchett boys, as the record discloses, and that he went to Mrs. McLain's house and the dogs barked and she turned on her electric porch light and he talked to her when she came to the door. She invited him into the house and they talked about clearing some timber from the place and some plowing his brother, George, was to do. They sat and talked for about two hours. The next thing he said he knew, Mrs. McLain was lying on the floor of the house about three or four feet from the front door. He related Mrs. McLain was lying on her back in a pool of blood and about six or eight feet from where Mrs. McLain was lying, there was either some wood or the floor burning, he did not know which. He said Mrs. McLain told him to take her out of her misery and he hit her across the forehead with the stick of wood he had in his hand. She did not say anything, thereafter, and he knew she was dead. He left and about two hundred yards from the house, he looked back and could see flames in the windows of Mrs. McLain's house. He finally got to the Pritchett home, as hereinbefore set forth.

The record discloses that the defendant, though an Indian, could readily read and write and did read and could understand the confession before he signed the same.

W. J. Thorne, a member of the State Crime Bureau, testified that on Monday, March 7, he and the sheriff were in the jail and talked to the defendant, Sam Pumpkin, that he was not threatened, coerced, or abused in any manner, that he talked of his own free will and accord, that he told them what had happened at the scene of the crime. He said that Mrs. McLain came in from outside the house with a pan and went over to where she washed dishes and the next thing he knew, she was lying in a pool of blood, that she was in agony and asked him to put her out of her misery and he hit her with a stick. Mr. Thorne further related that when he

got ready to leave and shook hands with Sammy, Pumpkin remarked, "When I first started drinking, Tom Finley told me if I didn't quit drinking and acting as I was that some day I'd kill my best friend." And then he said, "I guess that's what happened."

It is well to note that the State Chemist, Taylor Rogers, testified that he examined some scorched and charred clothing taken from the remains of the house, from under the area of the shoulders of the body and placed in a tin box by the sheriff, which contained body fluids, in his opinion human blood. ·

In substance, the foregoing constitutes the pertinent State's evidence contained in this 425-page record.

The defense of Pumpkin consisted of a repudiation of the confession and an attempt to trace the blood found upon his clothes to a nose bleed from which he occasionally suffered. The defendant admitted the drinking bout with the Pritchett boys on Sunday prior to Mrs. McLain's death. But after they separated, he testified, two men picked him up on the road and wanted help in locating the Pumpkin Center School. He got in their car and directed them. They got out and looked over the place and then brought him back to where they had picked him up and let him out and left going north. Before they left, they gave him a big drink of whiskey out of a fruit jar. Shortly thereafter, he started after them on foot, walking five miles to find them so he could get another drink of whiskey. He admitting seeing the Claud boy· fixing a tire and · asked him if he wanted help. A short distance north was the Ryal place·and just beyond that, Mrs. McLain's. The record shows he left the Claud boy going north toward Mrs. McLain's. ,

He denied killing Mrs. McLain and denied he ever went to her place. He testified he turned back and about midnight had another drinking· spree with a Noah Sheppard. Finally he· went to Pritchett's where he said the officers arrested him. He denied making any admissions to them in regard to the crime.

It was brought out on cross-examination that the defendant ·had been previously convicted of a felony and had served a term of four years in the penitentiary for forgery. He also served as, a soldier in General Patton's corps in World War II. ·

Furthermore, the pathologist who resides in Muskogee, Dr.· Tom S. Gafford, Jr., testified in substance that under the facts presented as hereinbefore set forth, it would be impossible to say whether the hole in the back of the skull was produced by a blow or falling debris. On cross-examination of Dr. Gafford, he testified that if the accused had stated that he beat the skull of the person involved with a stick of wood, it would have a big bearing on his opinion as to what produced the hole in the back of the skull.

The defendant contends that the State failed to prove the corpus delicti herein involved, by evidence independent of the defendant's confession. In Leeks v. State, 95 Okl.Cr. 326, 245 P.2d 764, 768, corpus delicti was defined:

> " 'In every criminal· prosecution it devolves upon the state to prove, first, the corpus delicti; second, that the crime charged was committed by the accused. The "corpus delicti" means, when applied to any particular offense, the actual commission by some one of the particular offense charged. * *

> " 'Direct and positive proof is not essential to establish the corpus delicti, and it may be proved by circumstantial evidence. When it is proved by circumstantial evidence, the question should be submitted to the jury along with other questions of fact in the case, as to whether or not the state has established the corpus delicti beyond a reasonable· doubt.' "

Ridinger v. State, Okl.Cr., 267 P.2d 175; Osborn v. State, 86 Okl.Cr. ·259, 194 P. 2d 176. In ·Barrett v. State, ·57 Okl.Cr. 259, 47 P.2d 613, 616, Judge Davenport quoted from·Frye v. State, 25 Okl.Cr. 273, 219 P. 722, on· proof of corpus delicti as follows: ·. .

" 'Direct evidence to establish the corpus delicti is not required. Circumstantial evidence may be resorted to for the purpose of proving the corpus delicti in the same way and to the same extent that it may be for the purpose of connecting the accused with the commission of the offense. The same evidence which tends to prove one may also tend to prove the other, so that the commission of the crime and the guilt of the accused may stand together inseparable on one foundation of circumstantial evidence.' "

Moreover, corpus delicti may be established without showing that the offense charged was committed by the accused. Gorum v. State, 60 Okl.Cr. 248, 63 P.2d 765.

■ But, the defendant contends that even if the foregoing be true, the corpus delicti must first be established before proof of the confession is admissible. In this connection, it has been held that the order of proof is generally matter for the discretion of the trial court, where the subsequent matter sufficiently establishes the corpus delicti. In State v. Anderson, 10 Wash.2d 167, 116 P.2d 346, 348, it was said:

"It is a well-settled rule of practice that the corpus delicti must be established before the admission of evidence linking the defendant with the crime charged. This rule, however, has a certain practical and well-recognized limitation, which is stated in 1 Wharton's Criminal Evidence, 11th Ed., 235, § 210, as follows:

" 'But in many cases, the two matters are so intimately connected that the proof of the corpus delicti and the guilty agency is shown at the same time. Hence, the order of proof in a criminal case is generally within the discretion of the trial court, and this prevails so generally that error committed in admitting testimony as to the guilt, before the proof of the corpus delicti, is cured where the subsequent testimony sufficiently establishes the corpus delicti.' * * * The corpus delicti must, of course, be established beyond a reasonable doubt. But the fact

of death may be found either by direct or circumstantial evidence or both. 30 C.J. 285, § 530; Timmerman v. Territory of Washington, 3 Wash. 445, 17 P. 624; State v. Downing, 24 Wash. 340, 64 P. 550; People v. Clark, 70 Cal.App. 531, 233 P. 980; People v. Hanson, 359 Ill. 266, 194 N.E. 520; Edmonds v. State, 34 Ark. 720; State v. Winner, 17 Kan. 298; McCulloch v. State, 48 Ind. 109. Without recapitulating the evidence above narrated, we believe it all but conclusively establishes the fact that the charred remains found in the ashes of the barn near Athol were those of David Johnson."

■ Such is the situation in the case at bar. Beyond any reasonable doubt, the charred remains found in the burning building northeast of Tahlequah were the remains of Mrs. McLain, and the circumstances under which she remained in the burning building constitutes sufficient evidence upon which the jury could reasonably conclude that she did not effect an escape therefrom because she was struck a fatal blow on the back of her head. In Commonwealth v. Turza, 340 Pa. 128, 16 A.2d 401, 405, the Supreme Court of Pennsylvania said:

" 'In such cases, the corpus delicti is proven where the circumstances attending the death are consistent with crime, though they may also be consistent with accident (Commonwealth v. Johnson, 162 Pa. 63, 29 A. 280), or suicide (Zell v. Commonwealth, 94 Pa. 258), and it is not necessary to show by affirmative proof that the latter two possibilities do not exist before evidence as to who did the act is admitted.' Commonwealth v. Gardner, supra, 282 Pa. [458] at page 464, 128 A. [87] at page 90. See also Commonwealth v. Coontz, 288 Pa. 74, 79, 135 A. 538; Commonwealth v. Marshall, 287 Pa. 512, 519, 135 A. 301; Commonwealth v. Bishop, 285 Pa. 49, 53, 131 A. 657. 'There is no rule of the criminal law which requires absolute certainty about this or any other question of fact. If it were otherwise, it would be impossible

to convict of any offence in any case. All the law requires is that the corpus delicti shall be proved as any other fact, that is, beyond a reasonable doubt, and that doubt is for the jury'. Gray v. Commonwealth, 101 Pa. 380, 386, 47 Am.Rep. 733; Commonwealth v. Puglise, 276 Pa. 235, 239, 120 A. 401. The corpus delicti having been properly and sufficiently established, appellant's own statements and admissions were undoubtedly properly received as evidence against him * *."

Under the foregoing rules, proof of the corpus delicti was a question of fact for the determination of the jury.

■ As the Attorney General asserts, consolidation of the evidence establishes proof of the corpus delicti. The evidence discloses that after defendant's all day moonshine whiskey drinking orgy, he was observed in a drunken condition shortly before he was seen talking with Mrs. McLain at her back door about 7:00 P.M. The record further shows that the defendant admitted taking a big drink of whiskey with two men just before he started north on foot toward Mrs. McLain's home. He was still under the influence of intoxicating liquor when he was arrested at 2:00 A. M. on March 7, 1955. When Mr. and Mrs. Cordray, who saw the defendant at 7:00 P. M., returned home from church about 10:30 P. M. they found the McLain home in flames. Mrs. Cordray and Pauline Marion saw something near the front door inside the burning house that looked like a body, where Dr. Hines discovered the body the next morning. Dr. Hines' testimony was sufficient to require submission of the evidence to the jury on the question of corpus delicti, buttressed as it was by the testimony of the other state's witnesses. Their evidence when considered as a whole supports the proposition that Mrs. McLain's death preceded the fire, and that it was, by reason of the fracture resulting from a blow to the back of her head. This proof established the corpus delicti. There remained only the question of identity.

In light of the foregoing proof of corpus delicti, and the defendant's confession, it is not unreasonable to conclude that the

defendant went to Mrs. McLain's to get money for whiskey. Upon being denied such aid, he struck her from behind, fracturing her skull and inflicting mortal wounds, which prevented her escape from the fire set by the defendant to cover up his crime. It is apparent if she had been able to escape, she would not have remained in the burning house. Then, too, the human blood found on the defendant's clothes is a strong link of circumstantial proof of both the corpus delicti and the defendant's guilt. In any event, these were questions of fact for the jury's determination. The evidence of the corpus delicti, though circumstantial, is, in our opinion, sufficient predicate to support the jury's finding. Moreover, we do not believe the evidence of the corpus delicti, under the foregoing facts, is consistent with either accident or suicide. But, as was said in Commonwealth v. Turza, supra, all the law requires is proof of corpus delicti beyond a reasonable doubt and that doubt is for the jury. We are of the opinion that the evidence on both the points of corpus delicti and identity is sufficient to support the jury's finding.

The defendant's second contention that the court erroneously admitted proof of the defendant's confession prior to proof of the corpus delicti, is met by the rule stated in State v. Anderson, supra, quoting from 1 Wharton's Criminal Evidence, 11th Ed., 235, § 210, supra.

■■ Finally, the defendant urges that if the evidence was sufficient to prove the corpus delicti, the court erred in its instructions in not defining corpus delicti to the jury, to which said instructions the defense objected. It is apparent that the court's instruction referred to is its instruction No. 2, wherein he attempted to define corpus delicti. This instruction is by no means a model. The court should have clearly defined the meaning of corpus delicti, but under the circumstances herewith presented, the same does not constitute reversible error, in view of the fact that the defendant merely interposed a general objection without specifically pointing out to the trial court the basis of the objection so that the trial court could have

corrected the defective instruction. Where the defendant desires definition of a term, he should request the same. Fooshee v. State, 3 Okl.Cr. 666, 108 P. 554, holds the failure of the court to define a legal term used in its instruction, where the defendant makes no request for definition of a term, is no ground for reversal. Roberts v. State, 29 Okl.Cr. 64, 232 P. 450. Logan v. State, 42 Okl.Cr. 1, 274 P. 39, 41, holds:

 " 'If the defendant wanted the term defined, he should have requested the court to define * * * [the same].' "

In Williams v. State, 97 Okl.Cr. 229, 263 P.2d 527, 534, it was held that it is not reversible error to fail to give an instruction where no request has been made to give the same. On defendant's failure to request an instruction and to point out the error of a given instruction, it was said:

"What we said in Wingfield v. State, 89 Okl.Cr. 45, 205 P.2d 320, 331, seems applicable:

" 'It takes unfair advantage of the trial court and the State. It is an attempt to create a point by technical silence which if urged would be obviated and the technicality destroyed. Such conduct is similar to complaining about the court's failure to instruct on a certain feature of a case, without at the time of trial suggesting the necessity of such an instruction. This court has often said it will not permit that kind of contention to prevail. * * * We do not feel constrained to make of criminal procedure a game, where the trial court must match wits with the lawyers in an effort to ascertain hidden purposes, which they may not choose to disclose, in order to gain future advantage.'

It has been repeatedly held by this court, if defendant's counsel is not satisfied with the trial court's instructions, which were given, and thought an additional instruction should be given, it was his duty to call the matter to the trial court's attention by a requested instruction. Cordonnier v. State, 86 Okl.Cr. 291, 192 P.2d 298. It has further been held an omission

of an instruction in the absence of a request will not constitute reversible error, Chapman v. State, 84 Okl.Cr. 41, 178 P.2d 638, particularly unless the Criminal Court of Appeals believes in light of the entire record and instructions, the defendant was deprived of substantial justice. Fields v. State, 85 Okl.Cr. 439, 188 P.2d 231."

To the same effect is Nance v. State, 43 Okl.Cr. 247, 278 P. 357.

The defendant submitted but one requested instruction which did not define corpus delicti and was less favorable to the defendant than the trial court's instruction No. 2.

 Good practice, however, requires that the court define what is meant by corpus delicti, otherwise the court's instruction may be apt to be confusing to the jury. However, we are of the opinion that, in light of the entire record and the instructions herein given, the defendant was not deprived of substantial justice and the court's failure to define corpus delicti does not constitute reversible error under the conditions herein presented.

Judgment affirmed.

JONES, P. J., and POWELL, J., concur.