*CHARLEY OVERTON v. STATE.

No. A-307.   Opinion Filed April 18, 1911.

(114 Pac. 1132.)

Rehearing Opinion April 20, 1912.

(123 Pac. 175.)

*Appeal from Tulsa County Court;*
*N. J. Gubser, Judge.*

Charley Overton was convicted of violating the prohibitory law, and appeals.   Affirmed, and cause remanded.

*Biddison, Campbell & Eagleton,* for appellant.

*Fred S. Caldwell,* for the State.

PER CURIAM.   Appellant was convicted in the county court of Tulsa county for violating the prohibitory liquor law, and his punishment was assessed at a fine of $100 and 60 days' imprisonment in the county jail.   We have carefully considered the brief of counsel for appellant, and have read over the entire transcript of the record and case-made.   We find that a demurrer was not filed to the information, and that no exceptions were reserved to the instruction of the court.   All of the questions presented in the brief have heretofore been decided by this court adversely to the contentions of counsel for appellant.   In view of the immense amount of work we have upon our hands, it would be a useless consumption of time and space to rediscuss these questions.   We think the evidence in the case amply supports the verdict.   The judgment of the trial court is therefore affirmed, and the cause is remanded to the county court of Tulsa county, with directions that it proceed with the execution of its judgment.

---

*Appealed to U. S. Supreme Court.

## OPINION ON REHEARING.

1.  **COMMERCE** — Intoxicating Liquors — Conveyance within State.
    The conveying clause of section 4180, Comp. Laws 1909, is not in
    conflict with the interstate commerce clause of the Constitution
    of the United States, and is not a burden on interstate commerce
    in intoxicating liquors.

2.  **STATUTES—Construction.** The statutes of the state of Oklaho-
    ma are to be construed in connection with and in subordination
    to the Constitution of the United States and the acts of Congress
    adopted in pursuance thereof.

3.  **INTOXICATING LIQUORS—Illegal Conveyance—Evidence.** For
    evidence sustaining a conviction for unlawfully conveying in-
    toxicating liquors from one place in the state to another place
    therein, see facts stated in the opinion.

4.  **APPEAL—Sufficiency of Evidence.** The jury are the exclusive
    judges of the weight of the evidence and the credibility of the
    witnesses; and, where there is any evidence in the record from
    which the jury could reasonably conclude that the defendant is
    guilty, this court will not disturb their verdict, upon the ground
    that it is contrary to the evidence, unless it affirmatively appears
    from the record that the jury were influenced by improper mo-
    tives in arriving at the verdict.

5.  **TRIAL—Misconduct of Jury—Impeachment of Verdict.** Miscon-
    duct occurring in the jury room while the jury was considering
    its verdict cannot be shown by the affidavit or testimony of a
    juror.

6.  **CONTEMPT—Impeachment of Verdict—Affidavit of Juror.** Every
    jury is sworn in each case to render a true verdict according to
    the law and the evidence. Where a juror files an affidavit or
    testifies that he was influenced by anything, in arriving at the
    verdict, except the law and testimony, he swears to his own dis-
    honor, and stultifies and impeaches himself, and informs the court,
    under oath, that he has been guilty of the grossest contempt in
    ignoring and disregarding the instructions of the court. He should
    therefore be punished for contempt of court.

7.  **APPEAL—Duty of Court.** Laws are enacted and courts are es-
    tablished to punish and suppress crime. If this court were to
    undertake to hunt for excuses to turn guilty men loose, it would
    be a gross perversion of its duty and an outrage upon the rights
    of the law-abiding people of the state. It is our duty to so con-
    strue the law as will protect society, and not be a source of en-.
    couragement and protection to crime and criminals.

8.  **SAME.** Lawyers look at a case from the standpoint of their
    clients' interest alone. But this court is charged with the double
    duty of seeing that no defendant shall be punished unjustly, and
    also with seeing that the rights of society are respected and pro-
    tected. We must therefore look at both sides of each record
    presented to us.

    (Syllabus by the Court.)

FURMAN, P. J. When this cause was first submitted we considered every proposition presented in the brief of counsel for appellant, but did not deem it necessary to discuss these propositions in detail, as we had already passed upon every one of them. On account of the zeal and ability with which counsel for appellant support their motion for a rehearing, we will, however, now discuss each proposition presented.

The first proposition is as follows:

"(1) Conveying Clause Unconstitutional. The conveying clause of section 4180, Comp. Laws 1909, is unconstitutional, because it discriminates against liquors purchased through an interstate shipment. It is in conflict with the interstate commerce clause of the Constitution of the United States, and is a burden of interstate commerce in intoxicating liquors."

We cannot agree with this contention. The statutes of Oklahoma are construed in connection with and in subordination to the Constitution of the United States and the acts of Congress passed in pursuance thereof.

In the case of *Maynes v. State,* 6 Okla. Cr. 487, 119 Pac. 644, this court expressly held that an interstate shipment of whisky constituted a lawful purchase, as contemplated by our statute.

In the case of *Titsworth v. State,* 2 Okla. Cr. 268, 101 Pac. 288, this court said:

"The Constitution of the United States declares that Congress shall have power 'to regulate commerce with foreign nations, and among the several states, and with the Indian tribes.' To 'regulate' means to control. So it is seen that the power of regulating or controlling commerce between the states is vested exclusively in Congress, and that no state has the power to pass any law upon this subject, or which would in any manner interfere with or abridge the right of one of its citizens to purchase in another state any article of commerce which could be lawfully sold in the state where the purchase is made, and bring it to his home in his own state for his personal use. This has been decided so often that no person who is well informed upon this subject will question the rule above stated. This matter has been passed upon by the Supreme Court of Oklahoma in *Schwedes v. State,* 1 Okla. Cr. 245, 99 Pac. 804, and by the Criminal Court of Appeals in the cases of *Huston Hudson v. State,* 2 Okla. Cr.

176, 101 Pac. 275; *Webb High v. State,* 2 Okla. Cr. 161, 101 Pac. 115, [28 L. R. A. (N. S.) 162], and *Josh McCord v. State,* 2 Okla. Cr. 214, 101 Pac. 280. The cases above referred to contain such a thorough discussion of this matter, and quote from such an overwhelming weight of authorities, that it is not necessary to repeat what will be found in them. If we are in error touching this matter, it will be an easy thing·for the enforcement officer of this state to make a test case in a civil proceeding, and carry it to the Supreme Court of the United States for final determination. If that tribunal sees fit to reverse its former decisions, we will be bound by such action, and cheerfully follow it. But, until this is done, we feel constrained to adhere to the decisions as they stand now.

"If the decisions of the Supreme Court of the United States are wrong, application should, and can, be made to that court for a reversal of these decisions. It is a waste of time, money, and labor to appeal to this court to set anything aside which that court has decided. The Supreme Court of the United States, of necessity, must be the final judge of the construction of the United States Constitution. Otherwise we would have a hydra-headed judicial system, in which 47 independent appellate courts could construe this instrument as they pleased, which would result, not only in confusion, but in civil war. Each tribunal would be supported by the military forces of the government which it represented. This would result in death and destruction to our form of government. Certainly no reasonable person desires this court to adopt a policy which would bring about such serious consequences as this. It would be treason itself. One thing can be depended upon, and that is that this court will not make any such insane attempt. Under the Constitution of the United States and the decisions of the Supreme Court of the United States, it is clear that any resident of Oklahoma can purchase intoxicating liquors in another state, and ship them into this state, and to points of destination, for his own personal use, and that such shipments constitute interstate commerce, and that any state law to the contrary is void. But these shipments lose their character as interstate commerce as soon as they reach the point of their destination, and any further shipment of such liquors is subject to state control. The exact language of the Supreme Court of the United States is as follows: 'Equally established is the proposition that the right to send liquors from one state into another state, and the act of sending the same, is interstate commerce, the regulation whereof has been committed by the Con-

stitution of the United States to Congress; and hence that a state law which denies such a right, or substantially interferes or hampers the same, is in conflict with the Constitution of the United States. * * * But the right of persons in one state to ship liquor into another state to his residence, for his own use, is derived from the Constitution of the United States, and does not rest on the state law. Either the conditions attached by the state law unlawfully restrain the right, or they do not. If they do, then they are void.'

"And, again, the court, speaking of the right of every citizen of a state to purchase and have shipped to him liquors for his own use, says: 'But the right arises from the Constitution of the United States; it exists wholly independent of the will of either the lawmaking or executive power of the state; it takes its origin out of the state of South Carolina, and finds its support in the Constitution of the United States. Whether or not it can be exercised depends solely upon the will of the person making the shipment, and cannot be, in advance, controlled or limited by the action of the state in any department of its government.' *Vance v. Vandercook,* 170 U. S. 439, 18 Sup. Ct. 674, 42 L. Ed. 1100.

"If a resident of this state may lawfully purchase intoxicating liquors in another state, and ship them to his place of business or home, for his own use, upon what ground can the claim be made that he cannot keep such liquors at his home or place of business, provided that he does so exclusively for his own use? Is it not true that the grant of power to do a certain thing includes and carries with it the right to do all things which are necessary to the full exercise and enjoyment of the power expressly granted? There can be but one logical answer to this question. If a person can lawfully bring intoxicating liquors to his home or place of business, so long as he does not attempt or intend to use such liquors, except for his own use, he has the right to keep them there. There is no logical escape from the conclusion that, if a resident of this state has the constitutional right to ship into the state intoxicating liquors for his own use, he has the same right to receive, keep, and use such liquors for the purpose for which they were shipped."

Our statute nowhere attempts to interfere with the right of any person in Oklahoma to purchase intoxicating liquors and ship them into the state as interstate commerce, and carry them as such to his home or place of business for his own use, and this right has been repeatedly recognized by the decisions of this court.

As we understand the decisions of the Supreme Court of the United States, this fully recognizes every right guaranteed by the commerce clause of the Constitution of the United States. We are still of the opinion that this question has been decided adversely to appellant by this court in our former opinions. If we are wrong in the conclusion at which we have arrived, as this presents a federal question, an appeal will lie from our decision to the Supreme Court of the United States, and, as we know that counsel for appellant are both earnest and able, we suggest that they carry this question to the Supreme Court of the United States for final determination.

The second proposition of counsel for appellant is that the verdict and judgment are contrary to the law and evidence, the contention of counsel being that the liquor in question was an interstate shipment which appellant was conveying from the depot to his home; and counsel assert that the evidence on this question is conclusive and undisputed. An examination will show that this contention is not supported by the record. This shows how easy it is for lawyers who look at but one side of a case to be honestly mistaken as to the effect of the testimony against their clients. But it is the duty of this court to look at both sides of a case, and to consider the entire record for the double purpose of seeing that a defendant has not been illegally convicted, and is not unjustly punished, and also to see that the rights of society at large are respected and protected.

The appellant testified in his own behalf that the liquor in question was an interstate shipment over the Missouri, Kansas & Texas Railway Company from Kansas City, Mo., and that when arrested he was conveying it from the depot in Tulsa to his home. He testified it was shipped in two boxes or cases; that when it reached Tulsa the tops and bottoms of the boxes were torn off, and he placed the whisky in a sack; that when he went to the depot and obtained the whisky it was 1 or 2 o'clock at night; that he obtained it from the freight house foreman, one Frank Carter; that appellant went to Carter's house and pulled him out of bed; that he went at 2 o'clock at night to get this whisky. On cross-

examination, he was asked what he was going to do with 10 cases of whisky the officers caught him with on the 10th day of June preceding, which question, upon the advice of counsel, he declined to answer, upon the ground that such answer would incriminate him.

Appellant was arrested on the night of July 1st. He testified that an expense bill which he offered in evidence, marked "Exhibit B," shows that the whisky was received at Tulsa on the 27th day of June prior to the time when appellant was arrested with it, but that he never went for the whisky until between 1 and 2 o'clock at night on July 1st.

Frank Carter, who was warehouse foreman of the Missouri, Kansas & Texas Railway Company at Tulsa, testified that on the night of June 30th, between 2 and 3 o'clock, appellant presented to him an expense bill on two cases of whisky, and requested him to deliver said whisky to appellant; that the whisky had been in the depot of the railroad company at Tulsa since the 27th day of June; that appellant came to the room of witness and woke him up, and had him get out of bed for the purpose of delivering the whisky; that he did not keep the warehouse open at night; that the regular hours for delivering goods at the depot were from 6:45 in the morning until 10 o'clock at night. This witness did not say anything about the boxes or cases in which the whisky was shipped being broken open, and that appellant had been forced to take the whisky away in a sack. His testimony establishes the fact that at the transaction to which he testifies he delivered to appellant two cases of whisky. This was all of the evidence introduced by appellant.

J. J. Morgan testified for the state that he was sheriff of Tulsa county, Okla. That about 2 o'clock on the morning of July 1, 1909, witness saw a cab at Elgin street, in the city of Tulsa, where it crosses the Frisco right of way, and that said cab was driving from the north; that witness ordered the hack to stop; that the driver did not do so until the witness drew his gun; that the driver saw the gun and stopped his hack, and appellant said, "You are not going to shoot, are you?" Witness re-

plied, "No," and witness then got into the hack and found a sack; that he asked what it contained, but does not remember what answer, if any, appellant made. The witness then seized the sack and found it contained 94 one-half pint bottles of whisky and two broken bottles.

Sam Walker testified that he was a policeman in the city of Tulsa; that he was present and acting with the sheriff when the arrest in this case was made. His testimony corroborated that of the sheriff in all respects. This was all of the evidence offered in behalf of the state.

Upon the trial of the case, the court, at the request of appellant, instructed the jury upon this issue as follows:

"The court further instructs the jury that if they find from the evidence that the defendants did carry intoxicating liquors from one place within the state of Oklahoma to another place within the state, but find that said intoxicating liquors had been shipped from a point within the state of Missouri, consigned to the defendants, or either of them, at the city of Tulsa, Tulsa county, Okla., and that the defendant consignee was carrying said intoxicating liquors from where he had received them from the common carrier which had brought them into the state of Oklahoma to his home, then you shall find the defendants not guilty."

It is seen by this that the court recognized the right of appellant to convey an interstate shipment of whisky from the depot to his home, and so instructed the jury.

In the case of *Maynes v. State*, 6 Okla. Cr. 487, 119 Pac. 644, this court expressly decided that intoxicating liquors received as interstate shipments constitute a lawful purchase of such intoxicating liquors, but that the burden is upon the appellant to prove this fact. The testimony of the state's witness made out a *prima facie* case against appellant. It is true that appellant testified that the whisky in question was an interstate shipment, and that he was conveying it to his own home; but the entire circumstances of the case throw suspicion upon his evidence, and we think warranted the jury in rejecting it. If the state was bound by the testimony of the defense, it would be impossible to obtain a conviction in any case. Even the most positive and direct evidence sworn to by a large number of witnesses may be entirely

destroyed by its inherent weakness. For instance, we are informed in the Bible that the Roman soldiers swore that while they were asleep the disciples stole the body of Christ. This sworn statement has always been rejected by intelligent people, for the obvious reason, if no other, that if the soldiers were asleep they could not tell what became of the body of Christ during that time. Appellant's testimony in this case could scarcely be more incredible. It was proven that it was not the custom of the railroad company to deliver shipments at night; yet we are asked to believe that appellant, between 1 and 3 o'clock at night, awoke the warehouse master and obtained this whisky which had been there for three days; that the two cases in which the whisky was shipped were broken and could not be carried, and appellant there-fore placed the whisky in a sack, although the defendant's witness, Carter, did not testify to anything of the kind. If it was true that the whisky constituted a legal purchase which appellant had a right to carry to his home, why the necessity of this secret manner of carrying it home? We have the answer in Sacred Writ: "They love darkness rather than light, because their deeds are evil." If appellant was using whisky for a lawful purpose, why did he claim immunity from answering the question which was asked him by the county attorney as to the ten cases of whisky previously found in his possession? If appellant and the cab driver were conveying the whisky for a lawful purpose, why was it that the sheriff had to pull his pistol before he could stop the cab and get the whisky? All of these circumstances fully warranted the jury in regarding the testimony offered by appellant as a fabrication, pure and simple. The jury saw these witnesses and heard them testify, and were in a much better position to judge of the truthfulness of their statements than are the members of this court. The credibility of the witnesses and the weight of their testimony is always a question exclusively for the jury, and this court will not disturb a verdict, where there is any evidence in the record from which the jury could legitimately reach the conclusion that the defendant was guilty. This question has been decided so often that it is not necessary to cite au-

thority in support of it. We are therefore still of the opinion that this court has repeatedly heretofore decided the issue presented contrary to the contention of counsel for appellant.

The third and last proposition submitted in the motion for a rehearing is that misconduct occurring in the jury room while the jury was considering its verdict can be shown by the affidavits or testimony of the jurors. This is not the law in Oklahoma. See *Colcord v. Conger,* 10 Okla. 460, 62 Pac. 276; *Petitti v. State,* 2 Okla. Cr. 131, 100 Pac. 1122; *Spencer v. State,* 5 Okla. Cr. 11, 113 Pac. 224; *Vanderburg v. State,* 6 Okla. Cr. 486, 120 Pac. 301; *Keith v. State, ante,* 123 Pac. 172. Every jury is sworn in each case submitted to it to render a true verdict according to the law and the evidence. After a verdict has been rendered, and a juror files an affidavit or testifies that he was influenced by anything in arriving at the verdict except the law and testimony, he swears to his own dishonor, and stultifies and impeaches himself, and he informs the court, under oath, that he has been guilty of the grossest contempt in ignoring and disregarding the instructions of the court. Instead of being encouraged to file such affidavits, or to give such testimony, when any such attempt is made, the juror should be severely punished for contempt of court. It matters not how any other court in any other state may have decided this question, we are not willing to place the administration of justice in Oklahoma at the mercy of such men. While we dislike to render a judgment which will result in punishment to any human being, yet we cannot avoid the duty imposed upon us to so construe the law as to protect the honest, hard-working and law-abiding people of the state. Laws are enacted and courts are established to punish and thereby suppress crime. It is no part of our duty to hunt for excuses to turn guilty men loose. We must seek to protect society, and not criminals.

In conclusion, we desire to say that we are always ready and willing and anxious to give respectful attention and careful consideration to all questions submitted to us for determination, either on the original submission, or on a motion for a rehearing; but we also desire to say that this court is flooded with briefs,

alleged arguments, and motions for rehearings, filled with wildest and most unwarranted statements as to the law and the evidence which are positively and vehemently asserted and plausibly maintained. We cannot decide cases upon these assertions; for, if we did, the rights, property, and lives of the people of Oklahoma would be completely at the mercy of the criminal classes. We are therefore compelled to look beneath the surface and carefully examine the records and consider the law and see what foundation, if any, there may be for the propositions submitted. We think that the facts and law in this case are against appellant, and that in his conviction justice simply claimed and marked its own.

The motion for a rehearing is therefore denied, with directions to the clerk of this court to issue the mandate without further delay.

ARMSTRONG and DOYLE, JJ., concur.