HOMER FRYE et al. v. STATE.

No. A-3979. Opinion Filed June 20, 1923.
Rehearing Denied Nov. 24, 1923.
(219 Pac. 722.)

(Syllabus.)

1. **Larceny—Evidence Sustaining Conviction of Grand Larceny in Nighttime from Person.** In a prosecution for grand larceny, evidence held to sustain a conviction for grand larceny in the nighttime from the person of another.

2. **Evidence—"Corpus Delicti" Defined.** The "corpus delicti" means, when applied to any particular offense, the actual commission by some one of the particular offense charged.

3. **Same—Corpus Delicti Established by Circumstantial Evidence.** It is not essential that the corpus delicti should be established by evidence independent of that which tends to connect the accused with its perpetration. The same evidence which tends to prove one may also tend to prove the other, so that the existence of the crime and the guilt of the defendant may stand together inseparable on one foundation of circumstantial evidence.

4. **New Trial—Deliberations of Jury—Impeachment of Verdict by Affidavits or Testimony of Jurors.** The deliberations of the

jury are secret, and ordinarily cannot be shown by the affidavits or oral testimony of the jurors.

5.     **Trial—Quotient Verdict Assessing Punishment—Validity.** A verdict in a criminal case, assessing the punishment at a certain number of years' imprisonment, will not be set aside upon proof that each member of the jury wrote down the number of years which he thought proper, and that the several numbers thus written down were added up and the sum divided by 12, where there is no proof that the jurors agreed beforehand to be bound by the result thus obtained.

Appeal from District Court, Carter County; Thos. W. Champion, Judge.

Homer Frye and another were convicted of grand larceny, and they appeal. Affirmed.

Charles A. Coakley, Thos. Norman, and James H. Mathers, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

DOYLE, J. The information in this case charges that the defendants, Homer Frye and Charley Burton, did in Carter county, on or about the 20th day of March, 1920, commit the crime of grand larceny, in that by stealth and fraud, and without the consent of the owner, during the nighttime, they did take, steal, and carry away from the person of G. B. Peel the sum of $700. Upon their trial the jury found them guilty and assessed their punishment at imprisonment in the penitentiary for the term of five years. From the judgment rendered on the verdict they appeal.

It is contended that the verdict of the jury in this case is not supported by sufficient evidence.

There is little, if any, conflict in the testimony as to the following facts:

The defendant Frye was running a pool hall on Caddo street, in Ardmore, and the defendant Burton was an employee at a place called the Mint. On the date alleged, G. B. Peel, representing a Root Beer Barrel Company, went to Ardmore and met Frye in his pool room. After talking over the root beer business they went to the Mint, a gambling house, where corn liquor was sold. Frye introduced Peel to Burton. After taking two or three drinks, Frye and Peel spent the afternoon visiting other joints and gambling houses, including a second visit to the Mint. Peel then went to his hotel, and after supper met Frye again. Later they met Burton, and all three went to Burton's room at the Randol and there spent most of the night drinking whisky and gambling. That Peel had been drinking to excess is conceded by all, and he was found the next morning in a dazed condition in the lobby of the Randol Hotel. All his money was gone, also his diamond ring. A policeman and a deputy sheriff searched Burton's room the next morning while he was in bed and found 13 $20 bills in his clothes. Later they arrested Frye, and he had one $20 bill and some small change.

It is argued by counsel for appellants:

"That in the absence of direct testimony of any one taking the money, the state cannot claim to have proved the corpus delicti, unless the money found on defendants the next day is identified as having been the property of Peel."

G. B. Peel testified:

"After supper I met Frye again, and later we met Burton on Main street. He went and got a pint of whisky. He said it cost $10, and I gave him $5. He suggested that we go to his rooms in the Randol Hotel. They gave me some kind of knock-out drops and relieved me of $700 and some odd dollars, also my diamond ring. The $700 was all in $20 bills. The last I remember, Burton and Frye and two

women were in the room. I woke up in the lobby the next morning. All my money was gone, also my diamond ring.''

Mrs. McIver testified:

''I was stopping at the Randol Hotel. That night about 9 o'clock, I met Mr. Burton, and he invited me to come to his room. Later I went in. Mr. Peel, Mr. Frye, Mr. Burton, and two girls were in the room. The men were drinking whisky and gambling. Mr. Peel had a great big roll of $20 bills in his hand. Mr. Burton said if they could not get his money gambling they had something else they were sure they could get it with. He was talking to us girls. While I was there they drank a pint, maybe a quart, of whisky, and they insisted on us girls not leaving, because they said they were going to get Peel's money, and they would split it with us if we would stay. Mr. Peel was well filled up, and so was Mr. Burton; but Mr. Frye did not drink very much. Mr. Frye insisted that I should not leave and suggested that they would split the money with me if I stayed.''

Cecil Crosby testified:

''As an officer I assisted in the investigation. I found Georgia Ray in the depot at Berwyn between 11 and 12 o'-clock the next night. I searched her and found a diamond ring and $17 in money. She said Peel gave her the ring; that she had a man drive her from Ardmore to Berwyn.''

The defendant Frye testified:

''About 11 o'clock Peel came back to my place and said he wanted me to walk around with him a little while. Mr. Burton came in a little later. Peel said: 'Burton has a room at the Randol Hotel. Suppose we go up there and meet some girls.' It was then about 12 o'clock. We went to Mr. Burton's room and took a few drinks and played cards. The girls came in while we were there. Mr. Peel had some whisky in his pocket and took it out and set it on the dresser and said, 'Everybody help yourselves.' I guess I was there an hour and a half. Mr. Jones came up there hunting Arthur Gill, and Mr. Peel invited him to have a drink. Jones took

one or two drinks.  We talked for 10 or 15 minutes, and when we got through talking only me and Jones were in the room.  I said, 'I believe I will go home,' and Mr. Jones and I walked down the hall and saw Mr. Peel talking with a man in his shirt sleeves.  Mr. Peel had some money in his hand when Jones came in.  One of the girls took his ring and said, 'Honey, I believe I will keep this ring.'  Peel said, 'Yes, you can have it, you can have anything I got,' and he waived the money in his hand at this girl.''

Witness denied making the statement if he could not get Peel's money gambling he would get it some other way.

The defendant Burton testified:

''The first time I met Peel was at the Mint.  He and Mr. Frye came in.  I think they came in the second time, about 11:30 that night.  I met them again at Mr. Frye's place.  Peel wanted to go somewhere to buy whisky.  I told him all the places in Ardmore closed about 11 or 12 o'clock. He said he had some in his pocket if we could go somewhere to take it, and Mr. Frye suggested that they go up to my room at the Randol.  We went to my room; and Peel had two pint bottles of whisky.  We had several drinks.  He wanted some girls, and I told him to ring for the porter.  He did, and it was not very long until the girls came in.  We were playing a game called 'twenty one.'  Some 10, 20, 30, and 40 dollar bets were made.  Quite a little money changed hands; possibly $200 changed hands in this game.  I suggested that he should give the girls some money, and I gave two of them $5 each, Mr. Frye gave one of them $5, and Mr. Peel handed one of them a $20 bill.  I started to the toilet and met two boys.  They asked me to come down on the next floor and take a drink with them.  I went to their room and took a few drinks and stayed quite a while.  When I came back, they were all gone.  I had about $300.  That was the money the officers found in my pockets the next morning.  I did not take any money off this fellow, and I did not make the statement, 'If I could not get his money one way, I would get it another.' ''

The claim that the corpus delicti was not proven, obviously is without merit. The "corpus delicti" means, primarily, "the body of the offense"; but in applying it, courts and text-writers have not at all times agreed as to what is meant by the "body of the offense." This court holds that the term means, when applied to any particular offense, that the particular crime charged has actually been committed by some one. Green v. State, 7 Okla. Cr. 194, 122 Pac. 1108; Brown v. State, 9 Okla. Cr. 382, 132 Pac. 359.

Direct evidence to establish the corpus delicti is not required. Circumstantial evidence may be resorted to for the purpose of proving the corpus delicti in the same way and to the same extent that it may be for the purpose of connecting the accused with the commission of the offense. The same evidence which tends to prove one way also tend to prove the other, so that the commission of the crime and the guilt of the accused may stand together inseparable on one foundation of circumstantial evidence. George v. United States, 1 Okla. Cr. 307, 97 Pac. 1052, 100 Pac. 46.

McClain says:

"The corpus delicti need not be shown by direct evidence, that is, there need not necessarily be proof of loss of property by theft distinct from the fact showing that property found in the defendant's possession was wrongfully taken from the owner thereof. Proof of the act is not necessary where the circumstances can only be explained by a felonious act." 1 McClain on Criminal Law, § 612.

It appears that the evidence connecting these defendants with the offense was entirely circumstantial. The test by which to determine the sufficiency of circumstantial evidence in a criminal prosecution is whether the facts and circumstances tending to connect the accused with the crime charged are of such conclusive nature as to exclude to a

moral certainty every rational hypothesis except that of guilt, and the jury in this case were so instructed by the court. It is the province of the jury to determine the circumstances surrounding the alleged crime, and if, assuming as proved the facts which the evidence tends to establish, they can be accounted for upon no rational theory which does not include the guilt of the accused, the proof cannot be said to have failed. Accepting therefore as true the testimony of the state's witnesses, the evidence does, we think, point with such certainty to the guilt of the defendants as to warrant the verdict found.

The second and last assignment of error is that the punishment assessed against these defendants was the result of a quotient verdict.

The record shows that in support of alleged misconduct of the jury, "in that the jury arrived at their verdict by striking an average," assigned as one of the grounds for a new trial, the court heard the testimony of two of the jurors. One J. A. Smith testified:

"One juror wanted two years, one wanted three years, five wanted five years, and two wanted ten years. I believe it was Mr. Taylor suggested that we all put down on a piece of paper the number of years and add them up and divide by twelve. We did that, and it gave them four years and ten months. Then we took a second vote of five years and it was unanimous."

The testimony of the other juror, D. A. Cochran, was in substance the same.

No objection was made in the trial court to the admission of this evidence, although it has been repeatedly decided by this court that a juror cannot be heard to impeach his verdict. Vanderburg v. State, 6 Okla. Cr. 485, 120 Pac.

301; Keith v. State, 7 Okla. Cr. 156, 123 Pac. 172; Overton v. State, 7 Okla. Cr. 203, 114 Pac. 1132, 123 Pac. 175; Star v. State, 9 Okla. Cr. 210, 131 Pac. 542.

The precise question here presented was passed on by the Texas Court of Criminal Appeals in the case of Cravens v. State, 55 Tex. Cr. R. 519, 117 S. W. 156, 16 Ann. Cas. 907. It is held that—

"A verdict in a criminal case, assessing the punishment of the defendant at a certain number of years' imprisonment, will not be set aside upon proof that each member of the jury wrote down the number of years which he thought proper, and that the several numbers thus written down were added up and the sum divided by twelve, when there is no proof that the jurors agreed beforehand to be bound by the result thus obtained, and when, in fact, the number of years finally determined upon was slightly different from such result, the jury having taken several votes after going through the process of addition and division. In order to vitiate a verdict determined by lot, the proof must show that the jury, before drawing lots, agreed to be bound by the result."

In this case it is not claimed that the jury did not unanimously agree as to the guilt of these defendants, and it is not shown by the proof offered that there was an agreement that the quotient should fix the punishment and the quotient was not agreed to in fixing the punishment.

In our opinion the trial court rightfully refused to set aside the verdict.

The instructions were full, fair, and correct, and covered all questions of law involved in the case. No others were requested by the experienced counsel who so ably represented the defendants.

A careful reading of the record convinces us that no error prejudicial to the substantial rights of the defendants was committed on the trial, and the verdict meets with our approval.

The judgments herein are therefore affirmed.

MATSON, P. J., and BESSEY, J., concur.