## CHESTER L. BARRETT v. STATE.

No. A-8873.   July 19, 1935.
(47 Pac. [2d] 613.)

Roy T. Wildman, Arthur Fitzpatrick, and Don Anderson, for plaintiff in error.

Mac Q. Williamson, Atty. Gen. (Frank B. Appleman, of counsel), for the State.

DAVENPORT, P. J.   The plaintiff in error, hereinafter referred to as the defendant, was convicted of murder, and his punishment assessed at death in the electric chair.

Dr. P. K. Lewis, testifying on behalf of the state, stated:

"I am a regular practicing physician and surgeon; I know the defendant; was called to the Barrett home the evening of May 3, 1934; the defendant, his wife, and six or seven children were suffering from convulsions; I treated Betty Joy Barrett and Mary Katherine Barrett; Betty Joy and Mary Katherine are now dead; the cause of their death was strychnine poison; I was the first doctor to arrive, reaching the Barrett home about 8 o'clock in the evening; Dr. McCallum and Dr. Schwabb came later."

Dr. C. L. McCallum, testifying, stated:

"I am a physician and surgeon of Sapulpa; I know the defendant; was called to his home about 9 o'clock the evening of May 3, 1934; when I arrived there the defendant, his wife, and defendant's family were there; I took charge of and treated Wanda Marie Barrett, one of the six children; she died of strychnine poisoning on the way to the hospital; I did not treat any other member of the family."

Fred E. Hopkins, testifying on behalf of the state, stated:

"I know the defendant; on April 16, 1934, I wrote the defendant's application for a family group insurance, and received a premium therefor."

On cross-examination witness stated:

"On the family group of insurance on a family of ten, in the amount of $1,000, it would pay on the death of the first member one-tenth of $1,000, on the second death one-ninth of $1,000, on the third death one-eighth of $1,000, and so on, regardless of which member of the family died. The defendant wanted himself made the beneficiary in said policy."

And, on redirect examination witness stated the de-

fendant was named as beneficiary; if any member of the family died, the defendant would receive the insurance.

Hannah Johnson testified in substance as follows:

"I am 19 years old; have lived in Sapulpa seven years; have known the defendant three years; I thought the defendant was married and separated from his wife; the defendant has professed to love me and said he would marry me as soon as he was divorced from his wife; I have had sexual relation with him; in November, 1932, I discovered I was pregnant, and on August 21, 1933, I gave birth to a child; the defendant was the father of that child; the defendant bore part of the expense of my confinement, and would send me a little money occasionally; defendant wrote me letters. On April 4, 1934, defendant gave me a letter addressed to Mary Ellen Johnson Barrett."

The letter was identified by the witness.

Willis C. Strange, testifying for the state, stated:

"I was sheriff of Creek county, Okla., on May 3 and 4, 1934; I know the defendant; on May 4, 1934, I brought the defendant to the county attorney's office; J. O. Edwards, chief of police of Sapulpa, Lee Snyder, deputy sheriff of Creek county, Bendena Hardy, and Sabe Christian, county attorney of Creek county, were present. The defendant was advised of his rights under the law, and made a statement in writing, which was taken down and transcribed by a reporter."

Witness Strange identified the statement which was marked Exhibit A, as being the statement made by the defendant, in the presence of the parties named in his testimony. Lee Snyder and J. O. Edwards testified in substance to the same as the witness Strange.

Mary Mizer, testifying for the state, stated:

"I have lived in Sapulpa for twelve years; I know the defendant and Hannah Johnson; Hannah Johnson came to

my house on the 3d day of August, 1933, she was pregnant and stayed at my house and was delivered of a child; the defendant would often call upon Hannah Johnson while at my house; altogether the defendant paid $18 for Hannah Johnson; after the birth of the child Chester told Hannah that he loved her and was going to marry her."

A letter was introduced in evidence, written by the defendant to Hannah Johnson, dated April 29, 1934, in which among other things mentioned the defendant declared he loved Hannah Johnson and referred to when Cora leaves. Another letter written by the defendant to Mary Ellen Johnson Barrett, on April 4, 1934, was also introduced.

The statement made by the defendant in the office of the county attorney, on May 4, 1934, was introduced, in which, amongst other things, the defendant states:

"My name is Chester L. Barrett; I am 35 years old; knew I did not have to make a statement, that anything I said might be used against me"; that he made this statement voluntarily; that his wife's name was Cora Lucile; that he had been married since November 1, 1920; had lived in Sapulpa for a year, working at odd jobs. The defendant gave the names of the members of his family, and stated that three of the children were dead, Betty Joy, Mary Katherine, and Wanda Marie; they died the night of May 3, 1934, about 8 or 9 o'clock.

"Last Monday night I thought if we could all go to sleep and not wake up God would forgive me; I began to wondering what to do and to find some easy way for us all to go out easy; I did not talk this matter over with my wife; she did not know my plans. On Monday I went to the creamery and got two gallon of sweet milk, about four or five o'clock in the evening I put a hand full of arsenate of lead in it; I bought the arsenate of lead at Wills-May last year for potato bugs; when I put the arsenate of lead in the milk my wife was in the front room attending to the

baby; when supper time came my wife cooked some corn-bread; my wife poured us all a glass of milk—I drank two or three glasses—I wanted to die at that time; my idea was I wanted to kill all of my children, my wife and my-self; no one died from the effects of that poison."

The witness further stated:

"At the time I put the arsenate of lead in the milk I did not know I still had the strychnine capsules at the house; I had not thought of them; I was looking through to see what would take us right quick and found this strychnine in a cupboard, Wednesday; it had been bought about a year and seven or eight months ago to kill rats with; I had no idea of poisoning my family when I bought it; when I found the strychnine I went down and bought some quinine at the Plymouth Drug Store. The reason I did not carry out my plans on May 2nd was I loved my children so much I could not bear it, they were all playing around me after supper and I could not get up the heart to do it.

"On the 3d day of May I decided to carry out my plans; we did not have any money to buy groceries and I did not know what we were going to do; after supper, when I decided to fix the capsules, it was about 7 or 7:30, a little bit before dark; there were eight capsules, I fixed them so there would be enough for all of us; I mixed the poison with a case knife, and fixed eight little capsules and two big ones; they all had bad colds and my wife was go-ing to give them castor oil, and I said to give them some quinine to clear their heads, I did not think they would be there in the morning to take the castor oil; I told them it was quinine I was giving them; no one saw me when I mixed the capsules; no one knew what it was except me, my idea was to kill myself, my wife and our children, the entire family. It was five or six minutes after the capsules were taken before Betty Joy got sick; she was the first one that died; she died in ten or twelve minutes; Mary Kath-erine was the next one to die; I was holding Dorothy's head and it struck me in the stomach, spine and head; I went

to a neighbor's house and called the doctor, they were suffering so."

Further on defendant stated he wanted to tell the truth about how it happened.

The defendant, testifying in his own behalf, stated where he was born and the different places he had lived before coming to Sapulpa, and further stated that he did not have any property, and was out of employment excepting for odd jobs at the time of the alleged commission of the offense charged against him. Many questions were propounded to the defendant as to his physical condition, his financial condition, and as to whether or not the family had sufficient food. The witness then stated he was brought to the courthouse the next morning after the death of his children, and gave the names of the persons present in the county attorney's office when he was taken to the office; he did not remember signing a paper that morning:

"I was sick; I remember what they talked to me about; they asked me what had taken place the night before at our home; I was frightened at the time; I don't remember what caused me to be frightened."

The defendant was then asked when he first met Hannah Johnson and he replied he could not state the exact day or month, he did not remember whether it was 1931 or 1932: "I met her at her home and commenced going with her, taking her out to different places;" he had a wife and seven children at that time; "it was in February, 1929, I met Hannah Johnson; I went with her about a year and a half; in April of this year I took her out to Moccasin Tracks addition one Sunday afternoon and read her a letter I had written Mary Ellen; the letter was in my handwriting; all this time I was worried beause I was not able to support my wife and children; for the last eighteen

months I had been supporting Mary Ellen and Hannah; I had sent the baby some milk each day; I had paid for Hannah's confinement at Mary Mizers, amounting to $18; I took the $18 away from my wife and children and gave it to Hannah; at that time my wife had eight children. In the letter I said I was worrying about my darling Mary Ellen and her sweet loving mother and was worrying myself to death about her; I do not know what I meant by the statement in the letter that I will be free by the 20th of this month, or I will be free by the 20th or last of this month. I do not know what I meant by the use of the language, if she don't come to me then I don't know that I am strong enough to go on trying to live."

It is not deemed necessary to set out all of the testimony of the defendant, or all of the statements made by him in the county attorney's office as it would lengthen this opinion further than is necessary. Some testimony was introduced by the defendant tending to show he was not just right mentally, but the verdict of the jury indicates the jury thought that he was sane and realized the consequences of his acts.

Several errors have been assigned by the defendant as grounds for reversal of this case. The only errors it is deemed necessary to consider are the fifth, sixth, and seventh assignments, which are as follows:

"The verdict of the jury is not supported by the evidence.

"The verdict of the jury is contrary to the law and the evidence.

"The court erred in overruling the motion for a new trial."

The defendant in his brief argues only the question

of the insufficiency of the evidence, and earnestly insists that the state failed to prove the corpus delicti. In presenting his argument that a conviction cannot be had upon the defendant's extra judicial confession alone, unless the state in some way proves the corpus delicti independent of the defendant's confession, the defendant cites Choate v. State, 12 Okla. Cr. 560, 160 Pac. 34, L. R. A. 1917A, 1287, Boyle v. State, 27 Okla. Cr. 196, 226 Pac. 389, and many other cases in support of his contention that the extra judicial confession is not sufficient to prove the corpus delicti; that there must be other proof positive or circumstantial connecting the defendant with the killing.

The defendant admits the evidence is sufficient to show the corpus of the crime, but insists that it is insufficient to show his connection with the crime and urges that there is no positive proof that he administered the strychnine that caused the death of Betty Joy Barrett.

The question to be determined by this court is whether there is testimony, direct or circumstantial, to show the defendant was responsible for the death of Betty Joy Barrett by administering to her strychnine independent of his extra judicial confession. If there is not, then the evidence on behalf of the state is insufficient to sustain the conviction, but, on the other hand, if the direct or circumstantial evidence, independent of the extra judicial confession, is sufficient to connect the defendant with administering the strychnine, the evidence is sufficient to sustain the conviction.

As disclosed by the record, the defendant was a man in ordinary circumstances, and had a wife and seven children in 1931, when he met Hannah Johnson, then a girl of about 16 years of age; that he became infatuated with her, kept company with her, cohabited with her, and that she

gave birth to a child of which defendant admits he was the father; he continued, as shown by the record, to keep company with Hannah Johnson and contributed money to pay for her confinement and after the child was born contributed some to the support of Hannah and the child; that he wrote loving and endearing letters to Hannah Johnson and spoke of what he would do "when Cora leaves," Cora being the lawful wife of the defendant; he also stated in some of the letters that he would be free about a certain date. In his testimony he states he did not know what he meant when he used the expression, "when Cora leaves," and that he would be free about a certain date. The defendant further states that he does not know what took place and what statement he made at the county attorney's office the day following the death of his three children. In his testimony he admits his relationship with Hannah Johnson and the writing of some of the letters.

The record further shows that a short time before the death of Betty Joy, and other members of defendant's family, and the illness of the others, that he applied to Fred E. Hopkins for an insurance policy of $1,000 and had himself named beneficiary in the policy, which policy in substance provided that upon the death of the first member one-tenth of the amount would be paid, and graduated down upon the death of any member of the family, and if the death of all of them occurred, the entire amount of $1,-000 would be paid.

In Choate v. State, supra, cited by the defendant in his brief, this court in the first paragraph of the syllabus, (b), in part said:

"To prove the corpus delicti is a simple matter. If a dead body is found with marks of violence upon it, or other circumstances that indicate that deceased came to

268

his or her death by unnatural or violent means, proof of such fact, independent of defendant's confession, establishes the corpus delicti in a murder case."

In Frye et al. v. State, 25 Okla. Cr. 273, 219 Pac. 722, 724, the court said:

"The claim that the corpus delicti was not proven, obviously is without merit. The 'corpus delicti' means, primarily, 'the body of the offense'; but in applying it, courts and text-writers have not at all times agreed as to what is meant by the 'body of the offense.' This court holds that the term means, when applied to any particular offense, that the particular crime charged has actually been committed by some one. Green v. State, 7 Okla. Cr. 194, 122 Pac. 1108; Brown v. State, 9 Okla. Cr. 382, 132 Pac. 359.

"Direct evidence to establish the corpus delicti is not required. Circumstantial evidence may be resorted to for the purpose of proving the corpus delicti in the same way and to the same extent that it may be for the purpose of connecting the accused with the commission of the offense. The same evidence which tends to prove one may also tend to prove the other, so that the commission of the crime and the guilt of the accused may stand together inseparable on one foundation of circumstantial evidence. George v. United States, 1 Okla. Cr. 307, 97 Pac. 1052, 100 P. 46."

Direct evidence to establish the corpus delicti is not required. Circumstantial evidence may be resorted to for the purpose of proving the corpus delicti in the same way and to the same extent that it may be for the purpose of connecting the accused with the commission of the offense, the same evidence which tends to prove one issue tends to prove the other, so the commission of the crime may stand together inseparable on one foundation of circumstantial evidence.

It is not disputed that defendant was infatuated with

Hannah Johnson; had been keeping her illicitly for years; he begun keeping her when she was about 16 years of age, seduced her, and she gave birth to a baby, and continued to visit her up until the tragic death of Betty Joy, his daughter. This illicit relation with Hannah Johnson and the infatuation for her caused the defendant to assist in supporting her, taking from his family things they needed for support, is sufficient circumstantial evidence to warrant this court in holding that this defendant disregarded his marital relation and his paternal affection for his children, and sought to destroy them in order that he might be free to go with Hannah Johnson. The only logical position with safety to society and sanctity of the home that the court can assume is that the corpus delicti in such cases as this may be proven by circumstantial evidence. The relations existing between the defendant and Hannah Johnson furnished the motive on the part of the defendant for the crime committed. Where the husband is untrue to his marital relations, the entire history of the human race shows that there is no crime he will not commit in order that he may gratify his illicit love. All of the circumstances in this case point with unerring certainty to the guilt of the defendant, and conclusively establishes the corpus delicti in this case.

In Edwards v. State, 46 Okla Cr. 77, 288 Pac. 359, the record shows the defendant had illicit relations with the wife of the deceased; that there was a $2,000 insurance policy on the deceased and the wife of the deceased was the beneficiary. There was no proof outside of the facts stated except the confession made by defendant which he repudiated at the trial. In paragraph 1 of the syllabus, the court said:

"Where a dead body is found with marks of violence

upon it, or other circumstances that indicate that deceased came to his or her death by unnatural or violent means, proof of such fact, independent of defendant's confession, establishes the corpus delicti in a murder case."

In the opinion the court further said that the jury should be instructed by the court, if they found from the evidence that the confession was a voluntary one, then they might consider it together with all the other evidence in the case in determining the guilt or innocence of the defendant. When the facts and circumstances in evidence in the case at bar are considered in connection with the extra judicial confession, we hold they are sufficient to support a verdict of guilty. The defendant's illicit love for Hannah Johnson, and his letters written to her are the motives behind the crime and are circumstances unanswerable that the defendant administered the strychnine that took the life of Betty Joy Barrett. The defendant was present at the time the strychnine was administered.

The defendant was accorded a fair and impartial trial. The court correctly instructed the jury as to the law applicable to the facts. There are no errors in the record warranting a reversal. The evidence is amply sufficient to sustain the charge of murder. The judgment is affirmed.

The original time for the execution having passed during the pending of this appeal, it is considered, ordered, and adjudged by this court that the judgment and sentence of the district court of Creek county be carried out by electrocution of the defendant, on the 20th day of September, 1935.

EDWARDS and DOYLE, JJ., concur.