## TAYLOR v. STATE.
### No. A–11979.

Criminal Court of Appeals of Oklahoma.
March 3, 1954.

Odes Harwood, Laynie W. Harrod, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

The appellant, Theodore Taylor, hereinafter referred to as defendant, was convicted in the district court of Oklahoma County of the crime of manslaughter in the first degree. The information charged him with the murder of Virgil Parrish by means of a knife. Punishment was fixed by the jury at imprisonment in the State Penitentiary for a term of ten years.

For reversal counsel asserts that evidence to sustain the conviction is insufficient and that the punishment assessed is excessive, but these propositions are not argued. In fact, the evidence is not abstracted, as required by Rule 7 of this court. 22 O.S.A. c. 18 Appendix. The record reflecting the evidence produced at the trial overwhelmingly repudiates the first two propositions, which no doubt accounts for the failure to urge the propositions further than mere statement.

The homicide occurred about 2 or 2:30 the morning of May 27, 1951, in front of the Brown Bomber beer tavern at 615 North Wisconsin, Oklahoma City.

The parties involved were young Negro men. There was but one eyewitness to the stabbing that resulted in the quick death of Virgil Parrish. The evidence disclosed that Parrish was 28 years of age, married and the father of two young children. The evidence further disclosed that though the defendant and the deceased both worked at Tinker Field Air Base, they were not acquainted.

The eyewitness, William P. Young, testified that he too was employed at Tinker Field, and as an aircraft mechanic's helper. He was a brother of Taft Samuel Young, and had arrived at the beer tavern where the killing occurred at about eleven o'clock that night. Witness testified that he and Virgil Parrish were standing in front of the tavern talking a short time prior to the difficulty; that Parrish walked around to the north side of the building for a few minutes, and that in the meantime the defendant Taylor walked out of the tavern and seeing witness, demanded that witness pay him $1.50 that he owed him. That then defendant started back in the tavern and about this time Parrish came from around the building, and defendant turned around and asked Parrish, "What the hell he had to do with it."

Witness further testified that he asked defendant not to accuse the deceased of anything as he did not even know what the defendant was talking about; that the deceased also advised defendant and told him that he did not even know him, and told defendant that he had no right to talk to him like he had; that he saw both Parrish and the defendant throw up their hands and he saw one flash and that the defendant broke and ran.

Witness further testified:

"Q. All right, what happened when Taylor broke and ran? A. Well, then I run up there to see what was the matter then and Virgil told me, he said, 'Run on in—' he just hit me on the shoulder and told me as I rushed to him—I had been there at the door —he just caught me on the back and said, 'Run on in the building there and call an ambulance. I am hurt, hurt bad,' just like that, and I rushed in and met my brother.

"Q. Before you went inside and told your brother to call an ambulance, did you observe Virgil's condition? A. No, sir, I didn't. The only thing I could see was blood just gushing out of him.

"Q. When they went together, were they on the sidewalk? A. They were standing about maybe a foot and a half north of the door.

"Q. Was that paved there? A. Close to the building, yes sir, that was paved.

"Q. Did you hear anything drop as they went together or immediately afterwards? A. No, sir, I didn't.

"(Objection overruled)

"Q. You stepped in the door then and called your brother to call an ambulance? A. Yes, sir. I met him just as he started to get up and I told him to run and call the ambulance right quick that Virgil was cut outside, and then I rushed over to Mr. Treat and told him to come out there and help me, that a man was out in front of his building cut awful bad.

"Q. What did you do then? A. Well, me and him run out to see about him, and when I got outside he had walked away from the door where I left him, about four feet right straight out in front of the building, kind of turning around, maybe staggering like, and when I rushed out there, why, he kind of reached his hand up and just catched me on the shoulder.

"Q. Did he have anything in his hands? A. I didn't see anything. And he fell about that time. I asked him what happened and by that time he fell.

"Q. All right, where did he fall? A. Well, he kind of—he just kind of fell right close to my feet.

"Q. What position was he in? Was he face down, or face up? A. As near as I can remember, he kind of sat down with one hand on the sidewalk, and just about, maybe four or five seconds, he fell on over with his head off the curb there.

"Q. All right, what do you recall happened then? A. Mr. Treat told us, he said, 'We can't do nothing for him'. He says, 'He is dead almost.'

"Q. And then what happened? A. Well, by that time my brother had come outside there from calling the ambulance and he said, 'The ambulance will be here in a few minutes', and he caughter hold of his hand and kind of pulled him, was going to pull his head up on the curb, and straightened him out on the sidewalk.

"Q. Did you ever observe a knife out in front there, except the one in his throat?

"(Objection overruled)

"A. No sir, I didn't see one."

A. D. Boyd, deputy sheriff, testified that about 12 or 1 o'clock on the night of the difficulty, he was making a routine checkup on the beer taverns and saw the defendant at the Off Beat Club. That the defendant had been drinking quite a bit, but was not drunk enough to be thrown in jail.

There was evidence of many other witnesses. The defendant, after arrest, signed a confession admitting the stabbing, but claimed that the deceased had a knife in his hand and was fixing to stab defendant, and that defendant pulled his knife from his pocket and stabbed deceased first, and ran. He denied knowing that there were two matches in his knife and under the blade that would enable him to open it quickly.

The evidence disclosed that no knife could be located at the scene of the difficulty, except the knife shown to have caused the death. Two or three days after the difficulty a knife was found on a lot (used as a ball ground) that adjoined the tavern, and the tavern owner turned this knife over to the officers, but a third party identified the knife as one belonging to him, and that he had lost while playing ball.

The defendant denied that he was drunk or had been drinking either beer or whiskey.

Of course the jury might have inflicted the death penalty, but apparently considered that the death was the result of mutual combat and that the stabbing of the deceased by the defendant was perpetrated without a design to effect death, and in a heat of passion by means of a dangerous weapon, and hence the verdict of manslaughter in the first degree. The punishment of ten years confinement in the State

penitentiary was extremely light, in view of the evidence.

■ This court has often said that the finding of a jury on a disputed question of fact will not be disturbed on appeal where there is competent evidence in the record to sustain their finding, and that this court would not reverse a case for insufficiency of the evidence unless it could say that there was no substantial evidence in the record upon which the verdict could be based. See Hood v. State, 93 Okl.Cr. 122, 225 P.2d 1032, and cases cited.

Defendant's final proposition presented within the space of about a page and a half of typewritten brief, is devoted to the proposition that the court erred in overruling his supplemental motion for new trial.

■ On February 3, 1953 defendant's original motion for new trial was overruled, and on the same day judgment and sentence was entered. Nearly five months thereafter, or on June 30, 1953 the defendant filed a supplemental motion for new trial, which, after hearing, was overruled on July 10, 1953.

The pertinent portion of the supplemental motion reads:

"Comes now the defendant in the above case and alleges and states:

"1. That one of the jury, Mabel Johnson, has an affidavit herein attached stating that the foreman of the jury knew said defendant and that on voir dire examination stated that he did not know the said defendant, and therefore causing the jury to be prejudicial to said defendant.

"We thereby ask the court to give the defendant herein a new trial."

The affidavit referred to and attached, reads in part:

"That while she was serving on the jury in the above captioned case of Theodore Taylor, after the jury went into the jury room the foreman of the jury said that he knew Theodore Taylor and that he deserved to have 25

years in the penitentiary, and that he insisted that we give him 25 years. However, the jury, being influenced by his decision, did give him 10 years; that he also said that he knew Theodore Taylor because he had been coming out to his service station and that he had run Taylor off a time or two."

There is no record in the casemade to substantiate the allegations in the supplemental motion for new trial to the effect that the foreman of the jury on voir dire examination disclaimed that he was acquainted with the defendant. We must assume that he made no such statement.

■ The question presented has had the attention of this court numerous times, however, and this court long ago adopted what seems to be the majority rule in the United States, including the Supreme Court of the United States. In an opinion by Doyle, P. J., in Brantley v. State, 15 Okl. Cr. 6, 15, 25, 29, 175 P. 51, in paragraph 3 of the syllabus, it was stated:

"Affidavits or oral testimony of jurors are inadmissible to impeach their verdict, and affidavits of the defendant, or any other person, of alleged misconduct of a juror, upon information derived from particular jurors, are inadmissible to impeach the verdict."

The body of the opinion may be referred to for reasons supporting the rule.

There are many other cases from this court on the subject, with varying factual situations. See Petitti v. State, 2 Okl.Cr. 131, 100 P. 1122; Keith v. State, 7 Okl.Cr. 156, 123 P. 172; Overton v. State, 7 Okl. Cr. 203, 114 P. 1132, 123 P. 175, Id., 235 U.S. 31, 35 S.Ct. 14, 59 L.Ed. 112; Roddy v. State, 47 Okl.Cr. 283, 287 P. 765; Leasure v. State, 48 Okl.Cr. 307, 290 P. 931; Neighbors v. State, 56 Okl.Cr. 108, 34 P.2d 290; Wheeler v. State, 66 Okl.Cr. 127, 90 P.2d 49; Williams v. State, 92 Okl.Cr. 70, 220 P.2d 836.

By reason of the above, the judgment of the district court of Oklahoma County is in all things affirmed.